IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| HUGO LOVO, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:16-CV-00853-Y |
| | § | |
| EXPRESS COURIER INTERNATIONAL, | § | |
| INC., d/b/a LSO FINAL MILE, *et al.*, | § | |
| | § | |
| Defendants. | § | |

---

## BRIEF IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ iii

I.      INTRODUCTION .......................................................................... 1

II.     IDENTIFICATION OF LIVE PLEADINGS ..................................... 2

III.    FACTUAL SUMMARY .................................................................. 2

        A.      Plaintiffs operated transportation businesses that serviced delivery
                routes for Amazon deliveries. .................................................. 2

        B.      Plaintiffs' businesses contracted to provide vehicles and qualified
                drivers. ................................................................................... 5

        C.      Plaintiffs controlled the day-to-day operation of their businesses. ........ 8

        D.      Plaintiffs were paid a piece rate for completed deliveries. ..................... 9

        E.      Plaintiffs' dispatches for Amazon deliveries ended due to Amazon's
                termination. ............................................................................ 10

IV.     STANDARD OF REVIEW ............................................................ 11

V.      ARGUMENTS AND AUTHORITIES ............................................. 11

        A.      Legal standard for determining independent contractor status under
                FLSA ....................................................................................... 11

                1.      Plaintiffs are not subject to LSO's control. ................................ 12

                2.      Relative investment in contracted for job indicative of
                        independent contractor status. .................................................. 21

                3.      Plaintiffs' opportunity for profit and loss was not determined by
                        LSO ....................................................................................... 22

                4.      Skill and initiative was required to perform as a contractor. ..... 25

                5.      Plaintiffs' contractual relationship was not permanent. ........... 27

        B.      No evidence supports assertion that EMP LSO Holding Corporation
                employed Plaintiffs. ................................................................ 29

        C.      Plaintiffs do not have sufficient evidence of overtime claims .............. 30

        D.      Plaintiffs were paid more than the minimum wage. ............................ 33

VI.     CONCLUSION ........................................................................... 36

CERTIFICATE OF SERVICE ..................................................................... 38

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946)...........................................31

*Bonnetts v. Articc Exp., Inc.*, 7 F. Supp. 2d 977 (S.D. Ohio 1998)...............................25

*Brock v. Mr. W Fireworks, Inc.*, 814 F.2d 1042 (5th Cir. 1987) ..................................12

*Browning v. CEVA Freight, LLC*, 885 F. Supp. 2d 590 (E.D.N.Y. 2012)....... 14, 20, 25

*Carrell v. Sunland Const., Inc.*, 998 F.2d 330 (5th Cir. 1993) ........................ 13, 20, 23

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)...............................................................11

*Christianson v. NewPark Drilling Fluids, LLC*, 2015 WL 1268259 (S.D. Tex. Mar. 19, 2015) ..............................................................................................................23

*Coberly v. Christus Health*, 829 F. Supp. 2d 521 (N.D. Tex. 2011)............................34

*FedEx Home Delivery v. NLRB*, 563 F.3d 492 (D.C. Cir. 2009) ..................................20

*Gate Guard Servs., L.P. v. Solis*, 2013 WL 593418 (S.D. Tex. Feb. 13, 2013)... passim

*Hagan v. EchoStar Satellite, L.L.C.*, 529 F.3d 617 (5th Cir. 2008) ............................34

*Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428 (5th Cir. 2005) ................ 31, 32

*Herman v. Express Sixty-Minutes Delivery Servs., Inc.*, 161 F.3d 299 (5th Cir. 1998) ......................................................................................................... 12, 13, 23, 28

*Hopkins v. Cornerstone, Amer.*, 545 F.3d 338 (5th Cir. 2008)............................. 12, 21

*Ihegword v. Harris Cnty. Hosp. Dist.*, 555 F. App'x 372 (5th Cir. 2014) ...................31

*Ihegword v. Harris Cnty. Hosp. Dist.*, 929 F. Supp. 2d 635 (E.D. Tex. 2013) ...........31

*Jackson v. Fed. Express Corp.*, 2006 WL 680471 (N.D. Tex. Mar. 14, 2006) ............35

*Kanida v. Gulf Coast Med. Personnel LP*, 363 F.3d 568 (5th Cir. 2004) ...................36

*Kirk v. Invesco, Ltd.*, 700 Fed. Appx. 334 (5th Cir. July 6, 2017) ........................... 32

*Krupicki v. Eagle One, Inc.,* 2014 WL 12710353 (E.D. Ark. Apr. 3, 2014) ............... 15

*Le Compte v. Chrysler Credit Corp.*, 780 F.2d 1260 (5th Cir. 1986) ........................ 31

*Little v. Liquid Air Corp.*, 37 F.3d 1069 (5th Cir. 1994)............................................. 11

*Little v. Tech. Spec. Prods., Inc.*, 940 F. Supp. 2d 460 (E.D. Tex. 2013).................... 31

*Luxama v. Ironbound Express, Inc.*, 2012 WL 5973277(D. N.J. Jun. 28, 2012) . 20, 21

*Mack v. Talasek*, 2012 WL 1067398 (S.D. Tex. Mar. 28, 2012) ........................... 23, 25

*Metzler v. Express 60-Minutes Delivery Serv., Inc.*, 1997 WL 397467 (N.D. Tex. May 21, 1997) ................................................................................................................... 23

*Miller v. Metrocare Servs.*, 2015 WL 477233 (N.D. Tex. Feb. 5, 2015) ..................... 36

*Oti v. Green Oaks SCC, LLC*, No. 2015 WL 329216 (N.D. Tex. Jan. 23, 2015)......... 31

*Reich v. Circle C. Inv., Inc.*, 998 F.2d 324 (5th Cir. 1993)......................................... 12

*Rose v. Digital Convergence.com Inc.*, 2001 WL 327843 (N.D. Tex. Mar. 30, 2001) . 31

*Solis v. Velocity LSO, Inc.*, 2010 WL 3259917 (D. Ore. Aug. 12, 2010) ............... 17, 25

*Talbert v. American Risk Ins. Co., Inc.*, 405 Fed. App'x 848 (5th Cir. 2010)....... 13, 14

*Taylor v. Waddell & Reed, Inc.*, 2012 WL 3584942 (S.D. Cal. Aug. 20, 2012) .......... 15

*Thibault v. BellSouth Telcoms., Inc.*, 612 F.3d 843 (5th Cir. 2010) ................... 17, 22

*U.S. v. Silk*, 331 U.S. 704 (1947) ................................................................................. 13

*Usery v. Pilgrim Equip. Co., Inc.*, 527 F.2d 1308 (5th Cir. 1976) ............................. 22

*Watson v. Graves*, 909 F.2d 1549 (5th Cir. 1990) ...................................................... 30

*Wherley v. Schellsmidt*, 2013 WL 5744335 (N.D. Tex. Oct. 23, 2013) ...................... 28

**Statutes**

29 U.S.C. § 203(e)(1) ................................................................................................... 12

## Rules

Fed. R. Civ. P. 56(c) ..................................................................................... 11

## Regulations

49 C.F.R. Part 376 ......................................................................................... 4

## Other Authorities

Douglas C. Grawe, *Have Truck, Will Drive: The Trucking Industry and the Use of Independent Owner-Operators Over Time*, 35 Transp. L.J. 115 (2008) ................... 4

Jean-Paul Rodriguez, Geography of Transport Systems (3d ed. 2013), https://people.hofstra.edu/geotrans/eng/ch5en/conc5en/lastmile.html ................... 4

Rosalyn Wilson, 26th Annual Council of Supply Chain Mgmt. Prof'ls State of Logistics Report: Freight Moves in the Economy in 2014 (June 23, 2015)............. 3

# I.

## INTRODUCTION

Under the terms of the contracts each Plaintiff voluntarily signed with Express Courier International d/b/a LSO Final Mile ("LSO"), each agreed to provide transportation-related services as independent contractors. That contractual term was not just a label; it described the parties' relationship. The record demonstrates that Plaintiffs were business owners operating corporations and sole proprietorships. Some profited; others did not. But all Plaintiffs were economically independent of LSO given their ability to service non-LSO customers, have others perform the contracted for work, negotiate rates, and own the equipment needed to provide the transportation services.

Not one Plaintiff alleges that LSO breached any of its obligations under the contracts they signed. Rather, Plaintiffs' claims seek to disavow those contracts based on their assertion that they should be considered LSO's employees. As demonstrated in Section V(A), the undisputed facts in the record defeat their claims and confirm the validity of the agreements they signed. As demonstrated in Section V(B), Plaintiffs have no employment relationship with co-defendant EMP LSO Holdings Corporation; each testified that they had no contract or familiarity with the company.

Even if Plaintiffs could establish that they were Defendants' employees, Plaintiffs have no evidence that would establish liability for overtime violations (Section V(C)). Specifically, Plaintiffs cannot show that they worked more than forty hours in any given workweek. Plaintiffs' admittedly speculative estimates of their

hours worked cannot satisfy their burden of proof to establish the amount and extent of the alleged work as a matter of just and reasonable inference. Even if one were to accept those estimates at face value, all but 5 of the Plaintiffs confirmed that LSO paid them at least the minimum wage (Section V(D)).

Finally, LSO did not reduce the delivery opportunities related to the "fulfillment of Amazon Prime Orders" (*Compl.* ¶ 210) because of this lawsuit as the "Retaliation Plaintiffs" allege; rather, Amazon terminated orders routed through LSO's Fort Worth location. There were no more Amazon deliveries to offer Plaintiffs or any other Contractor in Fort Worth. Of course, LSO continued offering Plaintiffs other deliveries. With no evidence of any link between an alleged adverse employment action and a protected activity, nor any evidence of pretext, LSO is entitled to judgment on this claim (Section V(E)).

## II.

## IDENTIFICATION OF LIVE PLEADINGS

Plaintiffs' live pleading is Plaintiffs' Second Amended Complaint. ECF No. 52. Defendants' live pleading is Defendants' Answer and Affirmative Defenses to Plaintiffs' Second Amended Complaint. ECF No. 55.

## III.

## FACTUAL SUMMARY

### A.   Plaintiffs operated transportation businesses that serviced delivery routes for Amazon deliveries.

Transporting goods from manufacturer to retailer or retailer to end user involves much more than the physical act of delivering those goods. It requires

coordinating the movement, arranging for warehousing of goods, as well as the actual delivery. Despite having a common objective, each aspect of the transportation process is unique and requires different skills. Costs associated with the transportation process from the point of origin to the end consumer accounted for approximately 8.3% ($1.45 trillion) of America's gross domestic product in 2014. App. 901.[1]

Given the significant costs, businesses often outsource management of their supply chain to third-party logistics companies like LSO to coordinate the efficient movement of goods. By leveraging LSO's logistics expertise, businesses can reduce transportation costs, increase efficiency in product movement, and focus on their core business. App. 918 ("shippers using [third-party logistics companies] have experienced an average logistics cost reduction of 9%, an average inventory cost reduction of 5%, and average fixed logistics cost reduction of 15%, and improvements in order fill rates of 60 to 66% and order accuracy of 61 to 66%").

LSO started in Memphis, Tennessee in 1984 with one facility, and now serves thousands of customers mainly in the healthcare, financial services, office products, pharmaceuticals, auto parts, and manufactured goods industries. App. 544. LSO's services fall within two main areas: (1) development of logistics strategies to reduce transportation costs and increase efficiency in product movement, which may include

---

[1] A true and correct copy of ROSALYN WILSON, 26th Annual Council of Supply Chain Mgmt. Prof'ls State of Logistics Report: Freight Moves in the Economy in 2014 (June 23, 2015), is included at App. 899-922.

facilitating the "last mile"[2] delivery of product through independent contractors; and (2) providing warehouse services for the storage of freight. App. 544-45. The facilitation of these deliveries requires an understanding of the costs associated with transporting the customer's products, the number of deliveries in a geographic area, frequency of delivery, product size, delivery date, and delivery time. LSO analyzes this data to determine the most efficient delivery process and the equipment necessary to transport the product. App. 545.

As a matter of course, LSO does not own or operate delivery vehicles needed to complete those last mile deliveries; instead it facilitates the actual delivery through Contractors who own or lease the vehicles necessary to effectuate the deliveries and have drivers qualified to transport products under LSO's motor-carrier authority. *Id.* LSO memorializes its relationships with Contractors through federally regulated Owner-Operator Agreements.[3] 49 C.F.R. Part 376, *et seq.* (Federal Truth-in-Leasing Regulations, which apply to motor carriers' leasing of commercial motor carrier equipment and related professional truck driving services from independent contractors); *see also* DOUGLAS C. GRAWE, *Have Truck, Will Drive: The Trucking Industry and the Use of Independent Owner-Operators Over Time*, 35 Transp. L.J. 115

---

[2] For an explanation of "last mile" or "final mile" deliveries, *see* JEAN-PAUL RODRIGUEZ, Geography of Transport Systems (3d ed. 2013), https://people.hofstra.edu/geotrans/eng/ch5en/conc5en/lastmile.html ("The 'Last Mile', notably for retailing, often consists of truck deliveries taking place over short distances, but likely in a congested urban setting and in less than full truck load (LTL). It is often one of the most complex element of the commodity chain to organize as it reconciles many customers, a variety of shipments and reliability difficulties related to congestion.") (last accessed Feb. 23, 2018).
[3] Plaintiffs' Owner-Operator Agreements will be referenced as the "Agreement." App. 547-62, 564-79, 582-97, 599-614, 620-37, 644-75, 677-92, 699-714, 722-33, 737-56, 762-837, 855-70.

(2008) (addressing historical use of independent contractor truck drivers operating under another company's motor carrier authority).

In that Agreement, Plaintiffs agreed that they would be independent contractors to LSO:

> **<u>OWNER-OPERATOR NOT EMPLOYEE OF CARRIER</u>**. It is expressly understood and agreed that OWNER-OPERATOR is an independent contractor for the Equipment and driver services provided pursuant to this Agreement. OWNER-OPERATOR shall not be considered, whether under the provisions of this Agreement or otherwise, as having the status of an employee of CARRIER for any purpose whatsoever . . . CARRIER is concerned only with the result achieved, not with the method used; therefore, OWNER-OPERATOR is free to select his/her own routes, as well as the sequence of deliveries so long as applicable customer requirements are met. OWNER-OPERATOR has the express right to accept or reject any assignment(s) from CARRIER and may advertise his/her services to other competitive companies.

Agreement, ¶ 14(c); *see also* App. 19-20, 66, 136-37, 198-99, 269, 412, 486-87, 503-04.

## B. Plaintiffs' businesses contracted to provide vehicles and qualified drivers.

Under the terms of their agreements, Plaintiffs furnished cars, sport-utility vehicles, minivans, and cargo vans, along with labor (sometimes provided by themselves, but often by drivers Plaintiffs hired), to transport and deliver packages. App. 25, 117, 138, 142-44, 148, 196-97, 238-42, 372-74, 378-79, 455-56, 501-02, 528. Plaintiffs purchased the vehicles specifically to be used as equipment to complete the delivery opportunities they accepted under the Agreement, often trading-in their vehicles to hold more cargo or purchasing additional vehicles so that they could increase their operational capacity, using additional qualified drivers to operate them. App. 24-26, 43, 57-58, 64, 138-39, 180-83, 197, 262-63, 302, 445. Before Amazon

terminated orders routed through LSO's Fort Worth location, the bulk of Plaintiffs'

services out of LSO's Fort Worth branch related to Amazon deliveries in Dallas/Fort

Worth. App. 11, 46, 109, 300-01, 314, 328-29, 410, 498-99, 532.

Plaintiffs decided how to run their businesses, including whether to hire others

to perform the work.[4] App. 545. Plaintiffs, not LSO, assumed the responsibility to

train their drivers, determined their rate of pay, set their schedules, and supervised

their work, as described by Plaintiff Masoud:

Q.   . . . What was included in that responsibility [to have a sub driver]?

A.   That we will have to train him. That I will find him work. I will
correct his mistakes and pretty much, you know, just like being his boss.

Q.   And you would be responsible for actually paying him?

A.   Yes. . . .

Q.   And you trained all four of those drivers?

A.    Yes.

Q.   And if they didn't do their job correctly, you're the one that
corrected them?

A.   Yes.

Q.   And you determined what portion of your work or the work that
you could obtain for them that they would do for you?

A.   Yes.

Q.   And you determined what portion of your pay would go to them for
their deliveries?

A.   Yes.

---

[4] Plaintiffs who operated more than one vehicle in their businesses were referred to as
"master contractors." The qualified drivers that a master contractor dispatched were called
"on-road resources." Plaintiffs who operate single vehicles were known as "independent
service providers." LSO did not interfere with Contractors' decisions regarding how to "lay
out their business" based on "their goals." App. 300.

App. 245, 275; *see also* App. 393-95 (T. Alfheed trained the 18 drivers hired to work for K&T Brothers, Inc.); App. 471 (Urbina trained his drivers on scanning and operating Road Warrior); App. 155 (Fields trained one of the drivers he hired).

As successful business owners, Plaintiffs' skills as Contractors went beyond mere driving. Contractors provided customer service for Amazon's customers; applied organizational, navigation, and management skills; and contributed knowledge and efficiency gained through past work experience in the transportation industry. Plaintiff Masoud, who had been an owner-operator for UPS Logistics, confirmed his value as an experienced Contractor through his experience:

> There's just a lot of small detail going into it, especially during peak time. . . the more you do it, the more you learn it, the more efficient you become. . . They never train you on that. You just learn. You teach yourself as you go.

App. 266-67 Plaintiffs attributed their success as Contractors to their skills in managing their businesses. App. 31 ("Q. Do you think that your position as a driver required a degree of skill? A. Yes, ma'am. I would say yes. . . Q. Did you see other drivers who were struggling and weren't as efficient as you? A. Most of them . . . They were asked to go home"). Contractors demonstrating their skills reported receiving additional volume of deliveries from LSO. *See, e.g.,* App. 77.

Plaintiffs Khalid and Tariq Alfheed had a sizeable operation, generating more than $630,000.00 in revenue while they were Contractors. App. 846 (K&T Brothers, Inc. received settlements of $502,579.06 from Apr. 7, 2016 to Aug. 19, 2017); App. 877-78 (K&T Brothers, Inc. received settlement of $14,506.60 from Aug. 17, 2017 to Nov. 9, 2017); App. 848 (T. Alfheed received settlements of $70,459.11 from Oct. 22,

2015 to Mar. 28, 2016); App. 847 (K. Alfheed received settlements of $45,028.50 from Sept. 24, 2015 to Mar. 26, 2016). Indeed, their business was so large, at the instance of their accountant, they incorporated K&T Brothers, Inc., which managed at least 18 drivers at various times. App. 383-94. Plaintiff Robinson worked in a family-owned business, RJC Couriers LLC, with as many as four vehicles available for dispatch. App. 351-52, 358.[5]

## C.   Plaintiffs controlled the day-to-day operation of their businesses.

Amazon's packages arrived at LSO's Fort Worth warehouse 7-days each week for sorting and delivery. App. 936. In turn, LSO dispatched Contractors to complete Amazon deliveries 7-days per week. Some Plaintiffs agreed to provide sorting, transportation, and delivery services for a specific geographic area based on zip codes. App. 12, 76, 203-04, 243, 246, 270-71, 297-98, 453-54, 533-38. Other Plaintiffs elected to accept work as "floaters," taking work offered as it was available and in different zip codes. App. 42, 48-49, 110, 114, 116, 411, 418-19, 512.

Contractors had the option of recruiting, training, paying, and supervising qualified drivers of their choosing to provide the delivery services. App. 7-9, 140-41, 143, 238-243, 245, 330-331, 452, 455-459, 461, 466-67. But some Contractors made the choice to provide their own driving services, indicating to LSO that they were

---

[5] Plaintiff Robinson is one of four plaintiffs who are unrepresented and have not expressed an intent to proceed *pro se*. ECF No. 67. Although Defendants noticed Plaintiff Robinson for oral deposition on several occasions, Defendants were not able to secure his deposition prior to counsel's motion to withdraw filed December 18, 2017. ECF No. 65. However, Plaintiff Robinson's father and business partner, Ricky Robinson, was deposed in a separate case, *Harris, et al. v. Express Courier International, Inc.*, 5:16-cv-05033-TLB, W.D. of Ark., and his testimony is offered to illustrate Plaintiff Robinson's role as a driver for RJR Couriers LLC.

available for service 7-days per week or as a floater on specific days. App. 617, 641, 695, 698, 719, 758, 761.

Contractors were free to decline offers of work from LSO, as well as to take on additional work. In fact, Plaintiffs declined work, sometimes because they deemed it unprofitable, and accepted different routes they preferred when they became available. App. 13. 60, 134-35, 255-59, 475, 512-13. Plaintiffs also controlled their schedules during the day, deciding when, where, and how long to take for lunch and other breaks; where and when to fill-up their vehicles with gas; and how to divide deliveries on their routes with multiple drivers. App. 79-80, 111, 153-54, 429, 482-83, 510. Plaintiffs determined the order of their deliveries and mapped their routes as they saw fit. App. 10-11, 86-87, 247-48, 251, 430-31, 451-52, 471-72.

**D.     Plaintiffs were paid a piece rate for completed deliveries.**

LSO paid a "per piece" settlement based on completed deliveries to Plaintiffs (if a sole proprietorship) or, for Plaintiffs such as the Alfheed brothers who formed K&T Brothers, Inc., to Plaintiffs' business entity. App. 336, 877-78, 891. The piece rate that Plaintiffs were paid varied, with some Plaintiffs negotiating higher rates for their routes. App. 285-86. For example, Plaintiff Masoud testified that he negotiated a rate increase for a route due to distance traveled and higher costs of operation:

> Q:    . . . had you ever asked for a rate increase for Azle or any other delivery you made?
>
> A:    Yes. We always go back and ask for more because of the cost to run further routes. . .
>
> Q:    Do you recall what you negotiated, the amount that was increased?

A:    They started with -- at the beginning with $3.50 plus $10 for gas allowance, but that wasn't enough because we were spending about almost $350 for fuel, and they gave us $4 per package. It's because the number of packages to Azle were not as -- They were not as of a high count like the ones that are closer because it's not so much of a dense area. . .

Q:    So it took longer to get out there and it was more expensive to get out there?

A:    Yes.

Q:    And then there weren't as many deliveries to make it worth your time?

A:    Yes.

Q:    So then you negotiated an increase to $4 per package?

A:    Yes.

App. 253-55.

Plaintiffs also generated income off of the deliveries their drivers made, paying their drivers flat rates or a percentage of the piece rate settlements paid by LSO. App. 8-9, 143, 145, 149, 376-378, 458, 463, 469. Plaintiffs' tax returns show they reported settlements from LSO as business income, not wages. App. 965-79, 953-64. 980-95, 996-1009. Plaintiffs also deducted the compensation they paid to their drivers or helpers as business expenses. App. 965-67, 953-64, 982-995.

**E.    Plaintiffs' dispatches for Amazon deliveries ended due to Amazon's termination.**

Around March 28, 2017, Amazon notified LSO of a termination of deliveries routed through LSO's Fort Worth branch. App. 166, 925-27; *see also Complaint*, ¶213 ("Corporate Defendants learned that Amazon would no longer use [LSO] to fulfill Amazon Prime Orders"). As a result, LSO no longer had Amazon deliveries to offer to Plaintiffs' businesses beginning on or about April 18, 2017. App. 23, 67, 112, 205-06,

252, 545. LSO reduced its capacity by terminating Agreements with some Plaintiffs, while other decided to leave because there was not enough work. App. 851-54, 923; App. 23 (Q. So in April of 2017, LSO lost the contract with Amazon? A. Yes, ma'am. Q. And you quit driving for LSO at that point? A. Yes, ma'am.").[6] Other Contractors such as Plaintiffs Tariq and Khalid Alfheed whose business, K&T Brothers, Inc., serviced a DHL route for LSO through November 2017, provided delivery services for other LSO customers. App. 374-75, 877-78. Still others transitioned to driving for other Contractors. App. 105-06, 478-79, 879.

## IV.

## STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment against a party who fails to sufficiently show any element essential to a party's claim.[7] The evidence here demonstrates "no genuine issue as to any material fact" exists on the following elements of Plaintiffs' claims: (1) employment classification; (2) overtime liability and damages; (3) minimum wage liability and damages; and (4) retaliation.[8]

## V.

## ARGUMENTS AND AUTHORITIES

### A.   Legal standard for determining independent contractor status under FLSA

---

[6] Plaintiffs Gomez, Tatum, and Wilder ended their contracts with LSO in 2016 and Fields' contract with LSO was terminated in February 2017. App. 132-33, 414, 416, 506, 639.
[7] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).
[8] Fed. R. Civ. P. 56(c); *Celotex Corp.*, 477 U.S. at 322-23.

Plaintiffs should be precluded from pursuing their FLSA claims because of their proper classification as independent contractors.[9]

Whether an individual is considered an independent contractor or an employee under the FLSA is determined by the "economic reality" test, which in the Fifth Circuit assesses the following factors: (1) the degree of control exercised by the alleged employer (Section V(A)(1)); (2) the extent of the relative investments of the worker and alleged employer (Section V(A)(2)); (3) the degree to which the worker's opportunity for profit and loss is determined by the alleged employer (Section V(A)(3)); (4) the skill and initiative required in performing the job (Section V(A)(4)); and (5) the permanency of the relationship (Section V(A)(5)).[10] Application of the economic reality test requires courts to "focus on whether the alleged employee, as a matter of economic reality, is economically dependent upon the business to which he or she renders his or her services."[11] "No single factor is determinative."[12] An analysis of these factors under the facts here demonstrate Plaintiffs' proper classification as independent contractors.

### 1. Plaintiffs are not subject to LSO's control.

The record establishes Plaintiffs had control over (i) their schedules, (ii) the ability to hire others to perform the work, (iii) compensation terms, (iv) training, (v)

---

[9] *See* 29 U.S.C. § 203(e)(1); *Hopkins v. Cornerstone Amer.*, 545 F.3d 338, 343 (5th Cir. 2008).
[10] *Herman v. Express Sixty-Minutes Delivery Servs., Inc.*, 161 F.3d 299, 303 (5th Cir. 1998) (citing *Reich v. Circle C. Inv., Inc.*, 998 F.2d 324, 327 (5th Cir. 1993)).
[11] *Herman*, 161 F.3d at 303 (citing *Brock v. Mr. W Fireworks, Inc.*, 814 F.2d 1042, 1043, 1054 (5th Cir. 1987)).
[12] *Id.*

working for others, (vi) and operation of equipment. The sum of these parts is the economic reality that Plaintiffs were not controlled by LSO. *E.g.*, *Herman*, 161 F.3d at 303.[13]

a.   *Plaintiffs had freedom over their schedule.* The freedom to reject work without penalty is indicative of independent contractor status.[14] In this case, Plaintiffs were free to decline offers of work from LSO. Plaintiff Masoud rejected an entire route, which was not profitable for him and his driver, co-Plaintiff Bira. App. 255-59. Plaintiff Bajracharya similarly rejected work without repercussion. App. 43. ("Q. When you rejected that extra work, anything happen the next day? A. No, ma'am").

Plaintiffs also were free to request specific assignments from LSO or other drivers. Castellanos requested a move to a different route that became available, as it was closer to his brother's area, co-Plaintiff Lovo, "just in case that he need help or I need help, we help each other." App. 76. Urbina started as "floater" driver, picking up available work on an ad hoc basis, but when a route became available he took it so that he could make more money. App. 474-75.

Plaintiff Wilder chose to work consistently as a "floater," which meant she was free to pick-up extra work or decline available work at her discretion. App. 512. Plaintiff Bira never wanted to add vehicles and drivers to his business, as doing so

---

[13] *Gate Guard Servs., L.P. v. Solis*, 2013 WL 593418, at *3-4 (S.D. Tex. Feb. 13, 2013) (citing *Carrell v. Sunland Const., Inc.*, 998 F.2d 330, 332, 334 (5th Cir. 1993)).

[14] *See U.S. v. Silk*, 331 U.S. 704, 707 (1947) (finding that the plaintiffs were independent contractors when they could refuse to take certain job assignments without penalty); *Herman*, 161 F.3d at 303 ("The district court found that Express had minimal control over its drivers. We agree. The drivers set their own hours and days of work"); *Talbert v. American Risk Ins. Co., Inc.*, 405 Fed. App'x 848, 856 (5th Cir. 2010) (finding that the plaintiff was an independent contractor when she controlled how much she worked for the alleged employer).

involved "too much" responsibility. App. 42. He acknowledged having little interest in "making[ing] more money" and elected the floater role because he preferred to only "work like few days, so that he could "get [his] shift finished, and go home." *Id.* Plaintiff Bira decided to wait at the warehouse until he had enough overflow packages from other drivers, "because it's not worth it to leave with four or five packages." App. 47.

Plaintiffs confirmed they were free to take care of personal matters, as they were not monitored by LSO. Fields "want[ed] the morning off" and "the evening also sometimes" and asked co-Plaintiff Urbina to cover his route. App. 474. Plaintiffs were free to determine when, where, and how long to take for lunch and other breaks. App. 79-80, 111, 153-54, 429, 482-83, 510-11. Plaintiffs testified they were free to take days off, but if they were responsible for servicing a specific Amazon route, they would ensure that the route was serviced by another qualified driver. App. 28-29 (Bajracharya took eight days off for vacation and would take other days off); App. 88-90 (Castellanos took at least one day off every month, went on 5-day vacation, with swing drivers covering his route).

And although some Plaintiffs testified that they always drove on the same days of the week, voluntarily choosing to adhere to a schedule does not indicate the existence of an employment relationship. *Browning v. CEVA Freight, LLC*, 885 F. Supp. 2d 590, 602 (E.D.N.Y. 2012) ("[A]lthough the Plaintiffs may have chosen to work on a more regular basis . . . voluntarily adhering to one's own set schedule does not render on an employee.").

b.   *Plaintiffs had ability to hire others to perform work.* Plaintiffs could hire and supervise drivers to make deliveries, further demonstrating Plaintiffs' independent contractor status.[15] Towards that end, there were Plaintiffs that developed their own operations by recruiting, training, and supervising other drivers. Plaintiff Masoud testified that he was interested in hiring drivers because "[w]e were told that there's an opportunity to grow our business, treat it as our business." App. 238-39. To that end, Plaintiff Masoud placed Craig's List ads, hired, trained, and paid a total of four drivers "just like being [a] boss," including his co-Plaintiff Bira. App. 238-43, 245. Similarly, Plaintiff Urbina testified that he placed an advertisement and hired a driver specifically to help him with the afternoon wave of deliveries so that he could have a lighter schedule. App. 466-67.

Plaintiffs hired drivers, set their rate of pay and dictated their schedules, such as Plaintiff Masoud's supervision over co-Plaintiff Bira:

Q.   So then after that what work did Mr. Bira do for you?

A.   Overflow.

Q.   So when you say he was doing overflow, were you splitting your deliveries in half?

A.   I used to go to the other drivers in the area that are close to my area and ask them if they need help covering their days off or if they have extra packages that they don't want -- that they can't deliver that Mr. Bira will be doing. And I gave Bira two of my days to cover for me.

Q.   Was that two days out of seven?

---

[15] *See, e.g., Krupicki v. Eagle One, Inc.,* 2014 WL 12710353 (E.D. Ark. Apr. 3, 2014) (finding driver's ability to "set the schedule, establish working conditions, pay all federal and state taxes, establish the rate of pay, and purchase all necessary insurance for himself and sub-agents" pointed to independent contractor, not employee, status)*; Taylor v. Waddell & Reed, Inc.,* 2012 WL 3584942, at *5 (S.D. Cal. Aug. 20, 2012) ("ability to hire assistants . . . points toward independent contractor status").

A.   Yes.

Q.   Were they the same days every week?

A.   No, they were not.

Q.   How did you determine what days he would cover for you?

A.   It's something that I worked out with him.

App. 246; *see also* App. 8-9 (Bajracharya hired a driver for the afternoons and paid him $2.00 piece rate); App. 457-58, 463, 466, 468-70 (Urbina gave his three drivers different schedules and pay).

Plaintiffs tailored the compensation arrangements with the drivers they hired and supervised. Plaintiff Tariq Alfheed testified that K&T Brothers, Inc. paid their experienced, faster drivers more than other less experienced drivers. App. 376-77. Plaintiff Urbina testified that he paid one driver a $100.00 daily rate, regardless of the number of pieces delivered, and he paid another driver $2.00 per piece, leaving Urbina to keep the remaining $1.00 per piece. App. 458, 463. Similarly, Plaintiff Fields paid his drivers 50% of the piece rate that LSO paid to Fields. App. 143, 145, 149. Plaintiff Woodrow had his girlfriend help him with deliveries, but did not separate her pay from his own because they had a single household. App. 534-35.

Plaintiffs also decided what equipment to provide drivers they hired. Plaintiff Fields bought a second vehicle for his driver. App. 140-41. Plaintiff Bajracharya provided a vehicle to his helper, paying all of his expenses for operation, including when his helper had a motor vehicle accident. App. 8-9 ("Q. And you paid the insurance for it? A. Everything, ma'am. Q. When he got into an accident, it was in

your Murano? A. He was in my van."). Plaintiff Urbina hired one driver who operated Urbina's cargo van, but another driver operated his own SUV. App. 465, 469.

Some Plaintiffs were paid by other Contractors, not LSO. App. 479 ("Q. Do you recall how Garrek compensated you in terms of the rate he paid you? A. No. He just paid me 1,000 a week. Q. Regardless of how many packages you delivered? A. Yes."); App. 245 ("Q. Did you have the same arrangement with [Plaintiff] Bira where if he made a delivery, he would get paid that amount that LSO would have paid you for that delivery minus the deductions? A. Yes, ma'am."); App. 526-27 ("Q. So while helping out Mr. Richardson, it was LSO that was paying you directly? A. That was paying him directly and he was giving me the money.").

c. *Plaintiffs decided the method and means for completing deliveries.* The lack of supervision over the method and means of work is indicative of independent contractor status.[16] Plaintiff testified that they determined the best way to load their vehicles, map their routes, and make deliveries. App. 83, 86-87 (Castellanos learned with experience how best to load his van, he decided to deliver in the closest area first, and took alternate routes); App. 267-68 ("A. . . . I try to tell [my drivers] over and over how to organize the boxes and where to put the large ones versus the smaller and smaller ones."); *see also, e.g.,* App. 140-41 (hired a driver so that he could take

---

[16] *See Thibault v. BellSouth Telcoms., Inc.*, 612 F.3d 843, 846 (5th Cir. 2010) (finding that plaintiffs were independent contractors when their supervisors only came by occasionally and never specified how they should do their jobs); *see also Solis v. Velocity LSO, Inc.*, 2010 WL 3259917, *4 (D. Ore. Aug. 12, 2010) (noting that driver's ability to make stops in any order was indicative of independent contractor status).

days off); App. 455-56, 461, 466-67 (Urbina advertised for and hired a driver to help him with the afternoon wave of deliveries so that he could have a lighter schedule).

Plaintiff Lovo testified that his experience delivering for FedEx taught him how most efficiently organize his deliveries:

> Q.   Did LSO ever tell you how to arrange your packages inside of your vehicle?
>
> A.   No.
>
> Q.   Did your experience at FedEx help you with how to organize your packages inside your vehicle?
>
> A.   That's right.
>
> Q.   And the more organized you were, the quicker you could deliver the packages?
>
> A.   Yes.
>
> Q.   And the more efficient you were, the quicker you got done at the end of the day?
>
> A.   Yes, that's right.

App. 223.

Most Plaintiffs decided to use an "app" called Road Warrior to organize the deliveries, but exercised discretion as to whether to follow the suggested order generated by Road Warrior when they determined a faster way of making their deliveries. App. 10-11, 218-20, 247-48, 251, 431-32, 451-52. Plaintiff Urbina also used Road Warrior to organize the division of his packages with the drivers he hired and managed. App. 472-73 ("Q. . . So you'd just make it clear through reviewing the Road Warrior app with your drivers which portion of the deliveries that they would be making? A. Yes."). Plaintiff Tariq Alfheed bypassed Road Warrior, as his prior experience at FedEx taught him to use Google Maps more quickly. App. 381-82.

Plaintiff Urbina described his contact with LSO dispatchers as infrequent and handled any issues from Amazon customers:

Q.   Other than contacting dispatch when you would have problems delivering to an apartment, any other reasons why you would have been in contact with dispatch during the day?

A.   Sometimes they would call us and ask us what was our ETA for certain packages.

Q.   What was your understanding of why they would call and ask you that?

A.   Because the customer was calling.

Q.   So was it your understanding the customer was expecting the package by a certain day and called dispatch?

A.   Yes.

Q.   Or maybe they complained to Amazon who called dispatch?

A.   Yeah.

Q.   And so then when dispatch would call you on those occasions, you would just tell them when you thought you would be dropping off at that location?

A.   Right.

Q.   Any other reasons why you would have had contact with dispatch?

A.   No.

Q.   Were you in contact with them on a daily basis?

A.   No.

Q.   How often?

A.   Maybe a few times a week.

App. 484-85. Other Plaintiffs provided similar testimony regarding the contact with LSO employees during the day. App. 91, 221-22, 299, 508-09, 539. The minimal contact that Plaintiffs had with LSO during the day is consistent with LSO's confirmation of fulfillment of Amazon's delivery requirements. *See* App. 936-39, 949-

50; *Carrell*, 998 F.2d at 332 (control factor weighted in favor of independent

contractor where customers dictated how welders did their job).[17]

    d.   *Plaintiffs trained each other and the drivers they supervised.* LSO provided no

training to drivers. App. 334. Instead, Contractors trained each other or learned on

the job. App. 266-68 (Masoud rode along with another driver and trained the drivers

he hired); App. 471 (Urbina trained his drivers on scanning and operating Road

Warrior); App. 84-85 (since Castellanos had prior package delivery experience from

FedEx, he was told "pretty much scan the package, verify and delivery it to the right

place"); App. 536-37 ("A. . . . I had to train her for like two days and then show her

how to use the Road Warrior's and the Datatrac. Q. And did -- did they give you a

number of days that you had train her for? A. No. They just said just train her, make

sure she can do the job."); App. 335; *Gate Guard Servs. L.P.*, 2013 WL 593418, at *4

(noting the significance of training and observing that the non-provision of training

indicates an independent-contractor relationship).

    e.   *Plaintiffs retained authority over the operation of equipment.* Cases

addressing employment classification disputes in the transportation industry

---

[17] *See also, e.g.*, *Browning v. CEVA Freight, LLC*, 885 F. Supp. 2d 590, 602 (E.D.N.Y. 2012)
(finding that "[w]hile there were certain time limits imposed upon the Plaintiffs as to when
they should pick-up or deliver packages, these constraints stemmed from the nature of the
business, as opposed to CEVA in particular. It is reasonable that a company such as CEVA
would impose boundaries of this nature in the shipping business"); *Luxama v. Ironbound
Express, Inc.*, 2012 WL 5973277, at *4(D. N.J. Jun. 28, 2012) (finding evidence that "drivers
are told where to report to work, what they will be paid and where to pick up and deliver"
products unavailing and deeming same drivers to be independent contractors under the
FLSA because "the fact that a person is required to be at a given place at a given time or
assigned work [is not] sufficient to support an employee-employer relationship"); *FedEx
Home Delivery v. NLRB*, 563 F.3d 492, 501, 503 (D.C. Cir. 2009) (rules based on concern for
customer service generally do "not create an employee relationship").

consider the individual's ability to select where to finance and repair the vehicle, and elect where to obtain insurance along with gas and oil stops. *E.g., Luxama*, 2012 WL 5973277, at *4.

None of the Plaintiffs purchased any vehicle from LSO, nor operated any vehicle owned by LSO. For example, Plaintiff Castellanos located a vehicle on Craigslist and paid cash. App. 65. Plaintiff Fields purchased his vehicle from a dealership and financed it. App. 146-47. Plaintiff Lovo financed a cargo van with a smaller engine for fuel efficiency, and paid cash for a second vehicle used by a driver he hired. App. 197, 207-11, 212-14. Masoud upsized to a minivan with more cargo space, which was cheaper but less fuel efficient than a cargo van he considered. App. 261-65. Prajapati drove a vehicle simply because it was the cheapest he could find. App. 302.

Plaintiffs also decided where to obtain insurance, and made the decision whether to shop around to find the cheapest policy. App. 14-15, 44, 108, 119, 184-85, 215. Plaintiff Wilder purchased the cheapest tires, while Plaintiffs Davis and Tariq Alfheed spent more money for a reliable tire. App. 118, 380, 515.

Plaintiffs also could decide to lease their scanner from LSO or to purchase it, as some Plaintiffs testified it was cheaper to buy it from a third-party. App. 17-18, 45, 82, 151, 216-17, 249-50, 433, 514.

### 2.   Relative investment in contracted for job indicative of independent contractor status.

"In applying the relative-investment factor, we compare each worker's individual investment to that of the alleged employer." *Hopkins v. Cornerstone*

*America,* 545 F.3d 338, 334 (5th Cir. 2008). LSO acknowledges its overall business investment exceeds that of any given Plaintiff (*see* ECF No. 63), but that fact does not say much about the nature of the parties' relationship. To get a sense of this factor's bearing on the classification question, one must look at "the amount the alleged employer and employee each contribute to the specific job the employee undertakes." *Thibault,* 612 F.3d at 847. Plaintiffs here agreed to provide "transportation related services and the use of the equipment" necessary to complete the contracted for jobs. Agreement ¶ 1. In conjunction with that specific job, Plaintiffs supplied their own vehicles, gas, insurance, maintenance, permits, licensing, and all other equipment expenses. Agreement ¶8(a); *see, e.g.*, App. 68-75 (Castellanos describing investment to operate two minivans and pay for fuel, insurance, maintenance, and repairs, which he deducted as business expenses on his taxes); App. 996 (T. Alfheed reporting $414,012 in business expenses for K&T Brothers, Inc.); App. 965 (Bajracharya reporting $62,630 in business expenses for 2016); App. 1003 (Urbina reporting $53,773 in business expenses for 2016). This investment is not insignificant and indicates the existence of an independent contractor relationship.

### 3.   Plaintiffs' opportunity for profit and loss was not determined by LSO.

The profit and loss factor is aimed at determining whether a worker or an alleged employer controlled the "major determinants of the amount of profit which the [worker] could make." *See Usery v. Pilgrim Equip. Co., Inc.*, 527 F.2d 1308, 1313 (5th Cir. 1976). In *Herman*, the Fifth Circuit found in favor of the courier company on this factor, where the "driver's profit or loss is determined largely on his or her

skill, initiative, ability to cut costs, and understanding of the courier business." 161 F.3d at 304. "[T]he drivers who made the most money appeared to be the most experienced and most concerned with efficiency, while the less successful drivers tended to be inexperienced and less concerned with efficiency." *Id.*[18]

Plaintiffs testified that they had the opportunity to control profit or loss by negotiating rates, adding vehicles, hiring drivers to increase hauling capacity, and managing operational costs.[19] One example of such negotiations comes from Plaintiff Masoud who negotiated a $.50 per piece rate increase "because of the cost to run further routes" (App. 253, 255) and later, still not satisfied with the route, telling the branch manager, "if you expect me to keep doing Azle, you're welcome to take all the work because I will not be able to fulfill my obligation to that route at the rate you're paying with the hours that we have to deliver[.]" App. 259. He dropped the route a few days later. App. 374-75, 394-396.

Plaintiffs Khalid and Tariq Alfheed meanwhile elected to add vehicles and drivers in an effort to increase profit. App. 369-72, 383-95. Their efforts resulted in a

---

[18] *See also Metzler v. Express 60-Minutes Delivery Serv., Inc.*, 1997 WL 397467, at *6 (N.D. Tex. May 21, 1997) ("A driver's profit or loss is determined largely on his or her skill, initiative, ability to cut costs, and understanding of the courier business.").

[19] *See Christianson v. NewPark Drilling Fluids, LLC*, 2015 WL 1268259, at *3 (S.D. Tex. Mar. 19, 2015) (assessing in the context of control factor the independent contractor's "freedom… in negotiating day rates, choosing which work to accept and which to decline"); *Gate Guard Servs., L.P.,* 2013 WL 593418, at *8 (analyzing Plaintiffs ability to negotiate rates, and utilize relief workers in context of opportunity for profit or loss assessment); *Carrell,* 998 F.2d at 332 (welders were independent contractors where, although company "exerted some control over the Welders' opportunity for profits by fixing the hourly rate and the hours of work . . . , the tax returns of [one welder] indicate[d] that the Welders' profits also depend[ed] on their ability to control their own costs."); *Mack v. Talasek,* 2012 WL 1067398, at *3 (S.D. Tex. Mar. 28, 2012) (finding that plaintiff gate attendants could increase profits by controlling costs related to office expenses, food, transportation, cell phone service, supplies, taxes, licenses, entertainment, advertising, contract labor, and insurance).

fleet of vehicles and 18 drivers operating for the business the Alfheed brothers formed, K&T Brothers, Inc. App.369-72, 873-76.

Examples of management of operational costs include Plaintiff Masoud who made a business decision when he invested in a minivan, rather than a cargo van:

> Q.   In choosing the Ford minivan did you look at other vehicles in terms of like fuel efficiency?
>
> A.   Of course. Of course I did. But in the market if the cargo van or van is more efficient, the price goes up versus if you get a minivan with a larger engine, it will be cheaper to purchase.
>
> Q.   And so it was a trade-off for you. You could get a cheaper vehicle with a little less fuel efficiency, and in your mind that was what made sense?
>
> A.   Yeah, for my budget at the time for whatever amount I allocated or I had to -- I was able to afford.

App. 264-65. Likewise, Plaintiff Bajracharya testified that he chose the cheaper insurance, cell phone plan, and scanner in order to save money. App. 15-17. He also rented a new vehicle each week for a month, as it was cheaper than buying a new vehicle. App. 25. Plaintiffs Castellanos and Fields located the cheapest locations to refuel. App. 80, 154. Plaintiff Prajapati shared an insurance policy with a friend in order to save money. App. 304. Davis obtained several quotes on insurance in order to compare policies for the coverage needed for her vehicle. App. 107-08.

Consistent with this testimony, tax returns from Plaintiffs and their business entities show itemized transportation business deductions, evidencing Plaintiffs' efforts to control operational costs. App. 965-79, 953-64. 980-95, 996-1009.[20] Plaintiffs

---

[20] *See Gate Guard Servs., L.P.*, 2013 WL 593418, at *8 (finding plaintiffs had an opportunity for profit or loss under the economic realities test by examining plaintiffs' tax returns, which indicated that they deducted business-related expenses for insurance, transportation, car

also deducted compensation they paid to drivers they hired and supervised. For example, Plaintiff Khalid Alfheed reported K&T Brothers, Inc. spent $257,850 in contract labor. App. 996. Plaintiff Lovo also reported $80,439 for contract labor for his delivery business. App. 955. Plaintiff Masoud issued Form 1099s to co-Plaintiff Bira in the amount of $17,740.00, since Plaintiff Masoud paid Bira directly for his work. App. 987.

### 4.    Skill and initiative was required to perform as a contractor.

A driver that manages the order of deliveries or route to take for a delivery in order to maximize profits and minimize losses generally is considered an independent contractor. *Browning*, 885 F. Supp. 2d at 608-09 (quoting *Bonnetts v. Articc Exp., Inc.,* *7 F. Supp. 2d 977, 981-82 (S.D. Ohio 1998)* (in the transportation industry, driving a vehicle with "loads of cargo requires a significant degree of skill," including skill in handling the vehicle and detailed knowledge of roadways); *Solis v. Velocity Express,* *Inc.*, 2010 WL 3259917, at *6 (D. Or. 2010) (citing cases finding that driver's ability to select preferred route and, thus, control the time spent working was indicative of independent contractor status). Plaintiffs admit that contracting with LSO was not as simple as driving from point A to point B. Plaintiff Bajracharya confirmed that many people did not last long in the job because they lacked the necessary skills. App.

---

and truck expenses, vehicle maintenance, supplies, equipment, and contract labor, among deductions); *Browning*, 885 F. Supp. 2d at 594 (noting that a plaintiff-driver's corporate entity took tax deductions for expenses incurred in providing delivery services); *Mack*, 2012 WL 1067398, at *4 (noting that the plaintiffs' income tax returns showed that they deducted business-related expenses for transportation, equipment, supplies, insurance, and other costs).

31. Indeed, the skills contemplated by the Agreement weigh in favor of an independent contractor status:

- Contractor "shall provide competent drivers" with "familiarity and compliance with state and federal motor carrier safety laws and regulations;" (¶ 7(a))

- Contractor "is free to select his/her own routes, as well as the sequence of deliveries so long as customer requirements are met;" (¶ 14(c))

- Contractor "has the express right to accept or reject any assignments from [LSO] and may advertise his/her services to other competitive companies;" (¶ 14(c))

- Contractor "assumes full control and responsibility for the selection, training, hiring, setting of grooming and dress standard, disciplining, discharging, setting of hours, wages and salaries, providing for unemployment insurance, state and federal taxes, fringe benefits, workers' compensation, adjustment of grievances, all acts and omissions, and all other matters relating to or arising out of [Contractor's] employment or use of drivers and laborers" (¶ 14(c))

- Contractor "shall be responsible for the loading and unloading of property transported" (¶ 18)

These responsibilities require planning skills as well as an understanding of pickup and delivery methods, as well as organization and vehicle know-how. They also require the skills of someone who is running their own businesses, training and managing employees, and interfacing with customers. Plaintiff Urbina described the skills required to be a good delivery driver:

Q.   As you became more familiar with your route, did you get more efficient?

A.   Yes.

Q.   And you got better at sorting?

A.   Yes.

26

Q.   Would you agree that there is a degree of skill to what you were
doing as a driver?

A.   Yes.

Q.   What kind of skill do you think it took to be a good driver for LSO?

A.   Speed, decision-making, solving problems.

App. 486.

For many of the Plaintiffs, these skills came from experience in transportation
and distribution. App. 381 (T. Alfheed learned to deliver packages quickly through
FedEx); App. 59-63. (Castellanos worked for M&T Hauling, Hazen Transport
Delivery, and a master contractor to FedEx Home Delivery); App. 200 (Lovo drove for
FedEx as a contractor for 12 years); App. 129-130. (Fields drove commercial vehicles
for Schlumberger and Halliburton); App. 235-36 (Masoudcontracted with UPS
Logistics during college); App. 446-47 (Urbina had over two years' experience in
receiving and warehouse work); App. 293. (Prajapati had experience in deliveries for
catering); App. 529. (Woodrow delivered furniture). Masoud testified that he gained
skill in "small detail" through experience as a driver, because the more you do it, the
more you learn it, the more efficient you become…You teach yourself as you go." App.
266.

That skill and initiative allowed Plaintiffs' Khalid and Tariq Alfheed to grow their
business, K&T Brothers, Inc., into an operation with 18 drivers at various times and
revenue in excess of $500,000. App. 383-94, 996. Plaintiff Robinson similarly grew his
family business, RJR Couriers LLC, into a four vehicle operation. App. 351-58.

**5.    Plaintiffs' contractual relationship was not permanent.**

Considerations that bear on the permanency factor include the length of the relationship between the parties, whether the worker provides similar services to other companies, and the worker's ability to terminate the relationship. *Herman*, 161 F.3d at 305.

A worker's ability to terminate their relationship with a purported employer weighs in favor of independent contractor status. *See Wherley v. Schellsmidt*, 2013 WL 5744335, at *1 (N.D. Tex. Oct. 23, 2013). The Agreement could be terminated with three-days' notice. Agreement ¶ 2.

Additionally, not being guaranteed work and considerations of the position as temporary weigh in favor of independent contractor status. *See Gate Guard Servs., L.P.*, 2013 WL 593418, at *10. Certainly, the deliveries on Plaintiffs' routes were not permanent because it was based on a fluctuating volume of cargo. Plaintiffs Bajracharya and Tatum described less work due to light cargo. App. 21-22, 415. When Amazon terminated LSO's orders in Fort Worth in April 2017, most of Plaintiffs no longer had any cargo to deliver. App. 67, 205-06, 333, 531. Some Plaintiffs found work through other Contractors delivering for LSO, but it is clear from Plaintiff's testimony that they did not consider their driving as a permanent position. App. 112-13, 115, 478-79, 480-81. Plaintiffs Tariq and Khalid Alfheed continued to operate their business, K&T Brothers, Inc., but adjusted their operation for a DHL route for LSO. App. 374-75, 387.

Plaintiff Masoud considered driving a temporary position while he was looking for a job. App. 237. Similarly, in October 2014 when she signed occupational accident

insurance paperwork, Plaintiff Wilder certified as true that she was a "part-time" "independent contractor." App. 505, 715.

As a floater who depended on work from other Contractors, Plaintiff Bira described that no work was guaranteed and he had the option to work as much as he wanted:

> Q. . . .   When you first talked with Bashar about driving, did he tell you to expect full-time employment or part-time employment?
>
> A.   He told me, if you show up, if people like you. They give you work.
>
> Q.   But he never said you're part-time driving or you're full-time driving?
>
> A.   No. He said if you come seven days, you might work seven days. If you come five days, you might work five days.

App. 49. Indeed, Plaintiff Masoud hired co-Plaintiff Bira to drive part-time. App. 242.

Plaintiffs were free to make deliveries for other companies, which weighs in favor of independent contractor status. Agreement ¶ 14. Indeed, Plaintiff Tariq Alfheed operated under K&T Brothers, Inc. for another company with a rented box truck. App. 397-98. Plaintiff Robinson quit driving for LSO through his family business, RJR Couriers LLC, for a period of time when the cargo volume decreased, drove for another company, and then later returned as an operator with RJR Couriers again delivering Amazon packages for LSO. App. 354-55.

## B.   No evidence supports assertion that EMP LSO Holding Corporation employed Plaintiffs.

Plaintiffs were not employed by EMP LSO Holding Corporation and there are no facts to support Plaintiffs' allegations of joint employment. When analyzing whether an entity is a joint employer for purposes of the FLSA, the Fifth Circuit

focuses on four factors: (1) does the alleged employer have the power to hire and fire the employees; (2) does the alleged employer supervise and control employee work schedules or conditions of employment; (3) does the alleged employer determine the rate and method of payment; and (4) does the alleged employer maintain employment records. *Watson v. Graves,* 909 F.2d 1549, 1553 (5th Cir. 1990). While no one factor is dispositive, Plaintiffs have no evidence to support any of these factors.

Plaintiffs testified that they had never heard of EMP or were not familiar with the company. App. 6, 104, 202, 234, 408-09, 443-44, 476-77, 497. EMP is the parent company of LSO with its principal office in Atlanta, Georgia. App.164-65; *Compl.* ¶ 158. LSO, not EMP, contracted with Plaintiffs. App. 547-62, 564-79, 582-97, 599-614, 620-37, 644-75, 677-92, 699-714, 722-33, 737-56, 762-837, 855-70. LSO, not EMP, paid Plaintiffs' settlements. App. 315-16, 321, 563, 580-81, 598, 615, 638, 676, 716, 838-845, 880-892. Plaintiffs' contractor files are kept at LSO's headquarters in Franklin, Tennessee, not in EMP's Atlanta office. App. 169. There is literally nothing to connect EMP with any of the allegations in this lawsuit, other than its parent relationship with LSO.

## C.  Plaintiffs do not have sufficient evidence of overtime claims.

Plaintiffs' independent contractor status alone requires summary judgment in LSO's favor. But Plaintiffs' failure to provide sufficient evidence that in any workweek they worked more than forty hours provides an alternative and independent basis for granting Defendant's summary judgment on the overtime claim. To advance an overtime claim, Plaintiffs must show that they performed

uncompensated work.[21] Accordingly, each Plaintiff "has the burden of proving that he performed work for which he was not properly compensated."[22] At the summary judgment stage, Plaintiffs must present sufficient evidence of the amount and extent of the alleged work as a matter of just and reasonable inference.[23] Plaintiffs must provide more than mere "unsubstantiated assertions."[24]

Courts in the Fifth Circuit have routinely granted summary judgment in cases where the plaintiff failed to proffer sufficient evidence to advance an overtime claim.[25] In *Harvill*, the Fifth Circuit upheld a district court's grant of summary judgment on plaintiff's claim that she was not paid for 210 hours of overtime in violation of the FLSA. 433 F.3d at 441. In affirming the grant of summary judgment, the Court noted that plaintiff "offered no factual allegations at all to substantiate her claim, and she presented no evidence of the amount or the extent of hours she worked without

---

[21] *Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 441 (5th Cir. 2005) (citing *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687-88 (1946)).

[22] *Anderson*, 328 U.S. at 687-88; *see also Le Compte v. Chrysler Credit Corp.*, 780 F.2d 1260, 1264 (5th Cir. 1986)).

[23] *Harvill*, 433 F.3d at 441 (plaintiff's assertion that she worked 210 hours of unpaid overtime was insufficient); *Rose v. Digital Convergence.com Inc.*, 2001 WL 327843 at *2 (N.D. Tex. Mar. 30, 2001) ("it is clear that a mere averment of hours worked does not constitute "definite and certain evidence" of actual hours worked").

[24] *Harvill*, 433 F.3d at 441; *see Ihegword v. Harris Cnty. Hosp. Dist.*, 555 F. App'x 372, 375 (5th Cir. 2014).

[25] *See Oti v. Green Oaks SCC, LLC*, No. 2015 WL 329216 at *3 (N.D. Tex. Jan. 23, 2015) (granting summary judgment when "[a]side from plaintiff's admitted guess as to how many overtime hours she worked, she has produced no factual allegations as to when those hours were worked, what work was accomplished, or for how many of those hours she was not paid"); *Ihegword v. Harris Cnty. Hosp. Dist.*, 929 F. Supp. 2d 635 (E.D. Tex. 2013) (case dismissed because the court found that the plaintiffs unsubstantiated and speculative estimates based on her memory were insufficient to create a fact issue for trial); *Little v. Tech. Spec. Prods., Inc.*, 940 F. Supp. 2d 460 (E.D. Tex. 2013) (case dismissed because the court found that the plaintiffs evidence was insufficient to show how many hours were uncompensated).

compensation." *Id.*; *see also Kirk v. Invesco, Ltd.* 700 Fed. Appx. 334, 336—337 (5th Cir. July 6, 2017), *petition for cert. pending* (applying *Harvill* in affirming district court's dismissal of an overtime claim because the plaintiff "failed to present sufficient evidence allowing a just and reasonable inference that she worked overtime" and the evidence plaintiff provided "does not validate [plaintiff's] assertion that she worked more than forty hours in any given week.").

Although Plaintiffs allege that they "routinely worked in excess of 40 hours in a given workweek," Plaintiffs admit that "[e]very day was different." App. 30, 460. There was nothing routine about their schedules in terms of volume and location of Amazon deliveries, since the number, addresses, density, and assistance from other drivers varied daily. App. 81. As a result of such daily fluctuations, Plaintiffs testified that they could not provide testimony about what times they finished their work. App. 507 ("Q. Was the time that you finished different every day?. . .  A. Yes."); App. 152 ("Q. And as you sit here today, you can't say on any day that you would have finished your route at any specific time, right, because it varied every day? A. Yes, it varied every day, but I -- yes, it varied every day."); App. 274 (admitting that he has done no calculations of what he thinks he is owed). For Plaintiff Tatum, a "floater" without a consistent route, he also could provide no testimony of overtime hours worked. App. 411 ("A. . . . I was just floating around, helping people out if they had a big order for the day. . . Q. Were there days when no one needed help? A: Yeah, yeah. . . . I would go home."), App. 434 (admitting that he has done no calculations of the alleged unpaid time worked for LSO).

Thus, without any testimony of a regular schedule or consistent work, the allegations in Plaintiffs' Complaint regarding the hours they worked cannot be squared with their testimony that any such estimate would be speculation. Consistent with *Harvill*, while Plaintiffs may present their unsubstantiated assertions that they are owed overtime, they can offer nothing more than their "best guess" of hours worked in any given week. Therefore, summary judgment should be granted on Plaintiffs' overtime claim.

## D.  Plaintiffs were paid more than the minimum wage.

Plaintiffs each assert that they worked seven days per week. *Compl.* ¶243; *see, e.g.,* App. 918, 920, 922 ("Plaintiff worked seven days a week"). In their depositions, not a single Plaintiff validated those allegations.[26] Even if the Court were to accept the complaint's allegations at face value, any compensation of at least $31,668.00 per year would reflect payment of $7.25 per hour. A review of twelve Plaintiffs' Form 1099s shows settlements paid by LSO to Plaintiff far in excess of the minimum wage.[27] Plaintiffs' compensation for 2017 similarly exceeds the minimum wage for the alleged days and hours worked in 2017, again assuming *arguendo* that the speculative estimated 12 hour days applied for the portion of 2017 that Plaintiffs worked as alleged in the Complaint.[28] *Compl.* ¶ 12, 20, 35, 43, 58, 66, 74, 82, 107, 114, 138.

---

[26] *See, e.g.,* App. 500 ("we had the weekends off"). App. 270-71 (Masoud testified he drove 5-6 days per week.); App. 115 (Davis testified LSO was closed Sundays for parcel deliver.); App. 29 ("You cannot be working like seven days a week . . .  sometime you get -- need off").
[27] App. 581, 598, 615, 676, 838-39, 841-43, 955, 957, 1003.
[28] App. 880-892.

| Plaintiffs Name | 2016 | 2017 |
|---|---|---|
| Bajracharya | $76,120.98 | $21,809.67 |
| Castellanos | $92,472.07 | $37,646.00 |
| Davis | $60,564.00 | $22,058.04 |
| Devulgt | $102,620.55 | $12,833.64 |
| Fields | $92,173.46 | $23,763.18 |
| K&T Brothers, Inc. (Plaintiffs' Khaled and Tariq Alfheed's business) | $374,746.09 | $181,986.49 |
| Lovo | $118,227.94 | $37,770.00 |
| Masoud | $95,375.31 | $24,768.00 |
| RJR Courier (Robinson's family business) | $229,053.88 | $130,803.52 |
| Tatum | $43,374.92 | N/A[29] |
| Urbina | $86,973.81 | $38,521.95 |
| Woodrow | $77,498.03 | $35,102.10 |

As a result, summary judgment on these Plaintiffs' minimum wage claims should be granted.

**E. Plaintiffs did not suffer retaliation for filing this lawsuit.**

Plaintiffs Lovo, Masoud, Gomez, Urbina, Castellanos, Wilder, Bajracharya, K. Alfheed, and T. Alfheed, the so-called "Retaliation Plaintiffs," allege that they were denied the opportunity work as Contractors for LSO as the result of their participation in this lawsuit. *Compl.*, ¶¶ 8, 17, 25, 40, 48, 63, 71, 79.

In order to establish retaliation under the FLSA, plaintiff must first make a *prima facie* "showing that: (1) he participated in protected activity under the FLSA; (2) he suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action." *Coberly v. Christus Health*, 829 F. Supp. 2d 521, 525 (N.D. Tex. 2011) (citing *Hagan v. EchoStar Satellite, L.L.C.,* 529 F.3d 617, 624 (5th Cir. 2008)).

---

[29] Tatum did not contract with LSO in 2017. App. 414, 416.

No causal link exists here given testimony that each Retaliation Plaintiff received offers to continue contracting with LSO after the lawsuit filing. Plaintiff Masoud testified that he was offered "a new opportunity that could be an alternative to the Amazon in case it gets cancelled," but he never made a final decision to accept that opportunity. App. 273. Nevertheless, Plaintiffs had the opportunity to submit a bid to service a route for LSO. App. 337-41. Indeed, Plaintiffs Khaled and Tariq Alfheed continued to perform as a master contractor through their business K&T Brothers, Inc., driving a DHL route for LSO through November 2017. App. 374-75, 387; App. 877-78. Plaintiff Robinson provided services as a Contractor to LSO throughout 2017. App. 879. Plaintiffs also had the option to drive for a master contractor, as Plaintiffs Urbina and Davis chose to do after April 2017. App. 105-06, 112, 478-79.

If for sake of argument the Retaliation Plaintiffs could make their *prima facie* showing, LSO's legitimate, non-discriminatory reason for its decision provides yet another basis for granting summary judgment in LSO's favor: LSO terminated routes around April 18, 2017 because its customer, Amazon, terminated its contract with LSO. App. 166-67, 546, 925-27; *see, e.g., Jackson v. Fed. Express Corp.*, 2006 WL 680471, at \*6 (N.D. Tex. Mar. 14, 2006) ("Because [defendant] has satisfied its burden to produce a legitimate, nondiscriminatory reason for [plaintiff]'s discharge, in order for [plaintiff] to survive summary judgment, he must create a genuine and material fact issue regarding the ultimate question of discrimination.").

"The ultimate determination in an FLSA retaliation case is whether the conduct protected by the FLSA was the 'but for cause' of the adverse employment decision."[30] With no employment, no adverse decision given the Retaliation Plaintiffs continued providing transportation services, and the loss of Amazon's business providing a non-discriminatory reason for not offering routes LSO no longer had, summary judgment in LSO's favor is required.

## VI.

## CONCLUSION

The record in this case belies every allegation in Plaintiffs' Complaint. Regardless of the standard applied, there is no way to square Plaintiffs' business operations, which included individual operational control and expansion of capacity, with their assertion that they should be considered employees under the FLSA. As demonstrated above, each of the factors relevant to that determination demonstrates that they were properly classified and operating as small businesses. Even if they had been able to adduce *some* evidence to support their claim of misclassification, the fact that they have *no evidence* creating a triable issue of material fact on their overtime and minimum wage claims compels the entry of judgment on those claims.

---

[30] *Miller v. Metrocare Servs.*, 2015 WL 477233 at *5 (N.D. Tex. Feb. 5, 2015) (citing Kanida v. Gulf Coast Med. Personnel LP, 363 F.3d 568, 580 (5th Cir. 2004) ("This court has repeatedly stated that in retaliation cases [under the FLSA] the employee must prove that the adverse employment action would not have occurred 'but for' plaintiff's protected activity.")).

Respectfully submitted,

/s/ Emily A. Quillen
Emily A. Quillen
equillen@scopelitis.com
Elizabeth M. Beck
ebeck@scopelitis.com
SCOPELITIS, GARVIN, LIGHT,
HANSON & FEARY, P.C.
801 Cherry Street, Suite 1075
Fort Worth, TX 76102
Tel: 817-869-1700
Fax: 817-878-9472

and

Andrew J. Butcher
*Admitted Pro Hac Vice*
abutcher@scopelitis.com
Adam C. Smedstad
*Admitted Pro Hac Vice*
asmedstad@scopelitis.com
SCOPELITIS, GARVIN, LIGHT,
HANSON & FEARY, P.C.
30 West Monroe Street, Suite 600
Chicago, IL 60603
Tel: (312) 255-7200
Fax: (312) 422-1224

**ATTORNEYS FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

On March 2, 2018, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court. I hereby certify that I have served all counsel of record electronically.

/s/ Emily A. Quillen
Emily A. Quillen

4843-8061-5518, v. 10