IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| HUGO LOVO, ET AL. | § | |
| | § | |
| VS. | § | ACTION NO. 4:16-CV-853-Y |
| | § | |
| EXPRESS COURIER INTERNATIONAL, | § | |
| INC., ET AL. | § | |

ORDER PARTIALLY GRANTING CROSS-MOTIONS FOR SUMMARY JUDGMENT

Pending before the Court is Defendants' Motion for Summary Judgment (doc. 74). Also pending before the Court is Plaintiffs' Motion for Partial Summary Judgment (doc. 81). After consideration of the motions, the related briefs, and the applicable law, the Court concludes that the motions should be and hereby are PARTIALLY GRANTED.

## I.   Factual Background

Defendant Express Courier International, Inc. ("Express"), is a third-party logistics company that assists businesses in delivering their products to the end consumer. Express provides its business customers with warehouse services for the storage of freight and facilitates the "last mile" of delivery of their products to consumers. These last-mile deliveries are generally over short distances in congested urban areas.

Express does not own or operate delivery vehicles but instead facilitates these deliveries by hiring drivers as independent contractors. The drivers provide their own vehicles to complete these deliveries and are paid on a piece-rate basis, agreeing to accept a certain rate of pay per package delivered for Express. During the period in question, the bulk of Express's services out of the Fort

Worth branch consisted of Amazon Prime deliveries in the Dallas/Fort Worth area.

Plaintiffs are a group of Express's former drivers who contend that Express violated the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*, regarding their work. Specifically, the drivers contend that, despite the fact that they signed independent-contractor agreements with Express, they were actually employees under the FLSA and should have been paid a minimum wage and overtime for making deliveries for Express. Certain of the plaintiffs also contend that Express retaliated against them in violation of the FLSA. Both parties have filed motions for summary judgment.

## II.  Summary-Judgment Standard

When the record establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," summary judgment is appropriate. Fed. R. Civ. P. 56(a). "[A dispute] is 'genuine' if it is real and substantial, as opposed to merely formal, pretended, or a sham." *Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 489 (5th Cir. 2001) (citation omitted). A fact is "material" if it "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

To demonstrate that a particular fact cannot be genuinely in dispute, a defendant movant must (a) cite to particular parts of materials in the record (e.g., affidavits, depositions, etc.), or (b) show either that (1) the plaintiff cannot produce admissible evidence to support that particular fact, or (2) if the plaintiff

has cited any materials in response, show that those materials do not establish the presence of a genuine dispute as to that fact. Fed. R. Civ. P. 56(c)(1). Similarly, a plaintiff movant must (a) cite to particular parts of materials in the record (e.g., affidavits, depositions, etc.), and (b) if the defendant has cited any materials in response, show that those materials do not establish the presence of a genuine dispute as to that fact. Fed. R. Civ. P. 56(c)(1). Although the Court is **required** to consider only the cited materials, it **may** consider other materials in the record. *See* Fed. R. Civ. P. 56(c)(3). Nevertheless, Rule 56 "does not impose on the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir.), *cert. denied*, 506 U.S. 825 (1992). Instead, parties should "identify specific evidence in the record, and . . . articulate the 'precise manner' in which that evidence support[s] their claim." *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994).

In evaluating whether summary judgment is appropriate, the Court "views the evidence in the light most favorable to the nonmovant, drawing all reasonable inferences in the nonmovant's favor." *Sanders-Burns v. City of Plano*, 594 F.3d 366, 380 (5th Cir. 2010) (citation omitted) (internal quotation marks omitted). "After the non-movant has been given the opportunity to raise a genuine factual [dispute], if no reasonable juror could find for the non-movant, summary judgment will be granted." *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317,

322 (1986)).

## III.   Analysis

### A.   Independent Contractor or Employee?

Under the FLSA, the plaintiff has the burden to demonstrate an employer/employee relationship. *See Eberline v. Media Net, L.L.C.*, 636 F. App'x 225, 226-27 (5th Cir. 2016).  Whether a worker is an employee or an independent contractor is a mixed question of law and fact.  *See Robicheaux v. Radcliff Material, Inc.*, 697 F.2d 662, 666 (5th Cir. 1983).  But "the determination of whether a particular factual setting gives rise to coverage under the FLSA is a matter of law." *Donovan v. Brandel*, 736 F.2d 1114, 1116 (6th Cir. 1984); *see also Wherley v. Schellsmidt*, No. 3:12-CV-0242-D, 2013 WL 5744335, *3 (N.D. Tex. Oct. 23, 2013) (Fitzwater, J.) ("The ultimate determination of whether an individual is an employee under the FLSA is a legal, and not factual, finding.).  Here, the parties largely agree as to the facts regarding the employee/independent-contractor analysis but disagree as to the conclusion to be reached from those facts.

The FLSA defines an "[e]mployee" as "any individual employed by an employer."  29 U.S.C. § 203(e)(1)(West 2018).  "Employer includes any person acting directly or indirectly in the interest of an employer in relation to an employee." *Id.* § 203(d).  And "[e]mploy" means "to suffer or permit to work." *Id.* § 203(g).  As a result, "[t]he definition of employee under the FLSA is particularly broad." *Hopkins v. Cornerstone Am.*, 545 F.3d 338, 343 (5th Cir. 2008); *see also Robicheaux*, 697 F.2d at 665 (Under the FLSA, "[t]he

term 'employee' is thus used 'in the broadest sense ever . . . included in any act.'") (quoting *Donovan v. Am. Airlines, Inc.*, 686 F.2d 267, 271 (5th Cir. 1982)); *cf. Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992) (noting that the FLSA's definition of "employ" "stretches the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles"); *Brandel*, 736 F.2d at 1116 ("In interpreting [the FLSA] the courts have construed the Act's definitions liberally to effectuate the broad policies and intentions of Congress").

In deciding whether a worker qualifies as an employee or is instead an independent contractor, "common law concepts of 'employee' and 'independent contractor' have been specifically rejected by the courts." *Robicheaux*, 697 F.2d at 666. And the fact that workers "signed contracts stating that they were independent contractors, while relevant, is not dispositive." *Id.* at 667; *accord Carrell v. Sunland Constr., Inc.*, 998 F.2d 330, 334 n.4 (5th Cir. 1993); *see also Robicheaux*, 697 F.2d at 667 ("An employee is not permitted to waive employee status."). Instead, courts "focus on whether, as a matter of economic reality, the worker is economically dependent upon the alleged employer or is instead in business for himself." *Hopkins*, 545 F.3d at 343; *see also Herman v. Express Sixty-Minutes Delivery Serv., Inc.*, 161 F.3d 299, 303 (5th Cir. 1998) ("In other words, our task is to determine whether the individual is, as a matter of economic reality, in business for himself or herself.").

To guide this assessment, courts consider the following non-

exhaustive factors:   "(1) the degree of control exercised by the alleged employer; (2) the extent of the relative investments of the worker and the alleged employer; (3) the degree to which the worker's opportunity for profit or loss is determined by the alleged employer; (4) the skill and initiative required in performing the job; and (5) the permanency of the relationship." *Id.*   "No single factor is determinative." *Id.*   The Court will now consider these factors in turn.

### 1. Control

"Under our economic-realities approach, '[c]ontrol is only significant when it shows an individual exerts such a control over a meaningful part of the business that []he stands as a separate economic entity.'" *Hopkins*, 545 F.3d at 343 (quoting *Brock v. Mr. W Fireworks, Inc.* 814 F.2d 1042, 1049 (5th Cir. 1987)).   "In analyzing the 'control' factor, courts focus on whether the alleged employer controlled the details of the job, including, for example, the worker's schedule, timing of breaks, training, compensation, supervision, and manner and method of the work performed." *Gate Guard Servs. L.P. v. Solis*, No. V-10-91, 2013 WL 593418, *3 (S.D. Tex. Feb. 13, 2013) (citing *Carrell*, 998 F.2d at 332, 334).   "[T]he lack of supervision over minor regular tasks cannot be bootstrapped into an appearance of real independence." *Usery v. Pilgrim Equip. Co., Inc.*, 527 F.2d 1308, 1312 (5th Cir. 1976).   Express contends that the plaintiffs were independent contractors, as stated in their contracts, because in actuality they "had control over (i) their schedules, (ii) the ability to hire others to perform the work, (iii) compensation

terms, (iv) training, (v) working for others, (vi) and operation of equipment." (Express's Br. (doc. 75) 12-13.)

Express contends that the drivers set their own schedules, determining when to take lunch breaks and when to take days off work. Express notes that plaintiffs Bajracharya and Castellanos took various days off work.  It admits, however, that its drivers were required to make sure their Amazon deliveries, which constituted the bulk of deliveries emanating from the Fort Worth branch, were covered while they were off work.  (Express's Br. (doc. 75) 5-6, 14.)

Express also alleges that drivers were free to reject work without repercussion, to request specific assignments, or to pick up extra work from other companies.  *See Herman*, 161 F.3d at 303 (concluding that employer had minimal control over delivery drivers where "[t]he drivers set their own hours and days of work and can reject deliveries without retaliation"); *but see Reich v. Circle C Invs., Inc.*, 998 F.2d 324, 327 (5th Cir. 1993) (affirming determination that workers were employees where they were "required to comply with weekly work schedules [and disciplined with] fines . . . for absences and tardiness").  In this regard, Express notes that plaintiff Masoud ultimately rejected an entire route he believed to be unprofitable, and plaintiff Bajracharya "similarly rejected work without repercussion."[1] (Express's Br. (doc. 75) 13.)  Express also notes that plaintiff Castellanos requested a change in routes to be

---

[1]Bajracharya's rejection of work appears, however, to actually have been rejection of **extra** work on a day when he had already completed his normal route and informed the dispatcher that he was feeling ill.  (Express's App. (doc. 76) 13.)

closer to his brother's route so they could cover for each other, and that some plaintiffs desired to remain "floaters" so they could pick up and decline work as they saw fit.

Express also notes that the drivers determined their own routes to achieve maximum profitability and could hire extra drivers to make more money. Express contends that each driver negotiated his piece-rate with Express.[2]  If drivers hired extra drivers, they trained them, determined the portion of their piece-rate they would pay them, and dictated their schedules. *See Krupicki v. Eagle One, Inc.*, No. 4:12-CV-00150-KGB, 2014 WL 12710353, *4 (E.D. Ark. Apr. 3, 2014) (noting that a driver's ability to "hire sub-agents to make some of his deliveries" and to "determine[] which deliveries his sub-agents made and also set their rate of pay" weighed in favor of independent-contractor status").  Indeed, plaintiffs Khalid and Tariq Alfheed developed "a sizeable organization, generating more than $630,000.00

---

[2]In support of this proposition, Express points to the deposition of Charles Moyer. (Express's Br. (doc. 75) 9 (citing "App. 285-86").)  Express failed, however, to submit the entirety of Moyer's deposition and wholly fails to otherwise explain who he is or how he has relevant knowledge of these facts. Plaintiffs submitted the entire Moyers deposition, however, and it appears from that submission that Moyers was formerly the Chief Commercial Officer for Express. (Pls.' App. (doc. 86-30) 2532.)  His testimony regarding the issue is, however, fairly conclusory.  (Express's App. (doc. 76) 285-86 ("Compensation between Express and a delivery driver . . . is negotiated between the contractor and the OPS personnel . . . . Typically, [the driver was negotiating] with the local personnel in that branch.").  Aside from Moyer's conclusory testimony, Express cites only one time when one of the plaintiffs (Masoud) negotiated a higher piece-rate than normal after he complained that he was not making anything on the route.

in revenue while they were [c]ontractors."[3]  (Express's Br. (doc. 75) 7.)  Additionally, Express notes that while driving for Express, Plaintiffs provided their own vehicles to use for delivery, and paid for their insurance, upkeep, and gasoline.

Plaintiffs counter, however, that their ability to set their own schedule was illusory.  Indeed, Express's regional director Lloyd Price wrote and posted a document at the Fort Worth location subjecting all drivers to a mandatory "check in time" of 9:00 a.m. and another mandatory "check out time" for deliveries of 11:00-11:15. The document required that all "wave 1" deliveries be completed before a driver came back for "wave 2" of deliveries in the afternoon. Drivers were required to check out with dispatch if they had a bad address for a package, as soon as a wave of deliveries was completed, if they were unable to make it back by 3:00 p.m. for the second wave of deliveries, and before logging out of "Data Trac" for the day. Price also dictated that for wave 2, all drivers had to be checked out no later than 4:30 p.m. and deliveries completed no later than 8:30 p.m.  (Pls.' App. (doc. 86-32) p. 2598-99.)

Plaintiffs' testimony about their work hours jibed with the requirements contained within Price's posting. Plaintiffs testified that Express set their hours and substantially extended those hours during peak periods. (Pls.' App. (doc. 86-1) 1-8.)[4]  They testified

---

[3]The cited evidence reflects that this amount was earned by the Alfheed brothers over the course of approximately four years. (Express's Br. (doc. 75) 7 (citing "App. 846").)

[4]Plaintiffs' appendix contains summaries of the testimony of each plaintiff regarding particular subjects.  The Court has independently verified that these summaries are true and accurate

that Express management generally required them to report by 9:00 a.m. at the latest--even earlier during peak periods--and they made deliveries until 9:00 p.m. (*Id.*) If they were late arriving, they were refused deliveries for the day and sent home without pay; similarly, if they failed to complete their deliveries by the 3:00 p.m. wave 1 or 9:00 p.m. wave 2 deadlines, they were threatened with having their routes taken away. (Pls.' App. (doc. 86-1) 9-13.) And although Plaintiffs decided when to eat lunch, take restroom breaks, and gas their vehicles, most testified that they either skipped lunch or ate on the run because their delivery schedule simply did not allow for breaks. (Pl.'s App. (doc. 86-1) 52-55.)

Furthermore, it appears that, in reality, the drivers' ability to take days off was not as unfettered as Express contends. For example, plaintiff Urbina was told he could not take a day off because another driver that Express put on his route was making too many mistakes. (*Id.* (doc. 86-15) 593-94.) Plaintiff Bira testified that he was getting calls to come in and cover other drivers on the holidays and was told that if he did not come in, he would be fired. (*Id.* (doc. 86-25) 1965.) And plaintiff Tariq Alfheed testified that he was required to leave his wife at the hospital during a C-section because dispatch called him to cover a route or threatened he would lose it. (Pls.' App. (doc. 86-20) 1201-02.)

Similarly, many plaintiffs testified that they felt unable to

---

representations of the actual testimony provided by the plaintiffs listed on the summaries. For ease of reference, the Court has cited to the summaries except where citation to a particular plaintiff's deposition testimony is more appropriate.

reject Express's requests for help with additional routes or deliveries. Plaintiff Bajracharya testified that he often was called back in from his delivery route to help other drivers and that when he once told Express that he did not want to help with the Trophy Club route, he was told "you're not helping the company. And you might lose your route." (Pls.' App. (86-18) 895.) He further testified that he "just couldn't reject them like saying, 'Hey, I don't want to do it.' Because I know the [con]sequences. The next thing they are going to tell you is if I don't do it, they will say, like, you may lose your route." (*Id.* at 892.) Similarly, Tariq Alfheed testified that he couldn't just notify dispatch that he could not cover a run "[b]ecause if I do that, I would lose my job." (*Id.* (doc. 86-20) 1202.) Plaintiff Prajapati testified that he could not refuse a delivery because "I would lose my job or . . . he would get mad. I mean, you couldn't say no." (*Id.* (doc. 86-21) 1403-04.)

Several of the plaintiffs testified that they received initial training from an Express team leader or warehouse supervisor named "Darian" when they commenced work as a driver. (Pls.' App. (doc. 86-1) 48-51.) Plaintiff Lovo testified that Darian trained him for one week on "[h]ow to use the scanner, how to deliver the package, where to put the package," and that the training included riding along with Darian while he made some of the deliveries. (Pls.' App. (doc. 86-13) 294-96.) Plaintiffs also note that they were required to wear a uniform they purchased from Express containing the Express logo and to display an Express decal on their vehicle while making

deliveries.[5] (Pls.' App. (doc. 86-1) 37-47.) *Compare Herman*, 161 F.3d at 302 (independent contractors in part because uniforms were not required, just preferred), *with Flores v. Velocity Express, LLC*, 250 F. Supp. 3d 468, 473 (N.D. Cal. 2017) (drivers were employees in part because they were required to wear company uniform and place signage on vehicles). And if Plaintiffs were late appearing for work or did not have on the correct Express shirt, they were sent home for the day without pay.  Repeated infractions resulted in their routes' being taken from them.  (Pl.'s App. (doc. 86-1) 9-11.); *Compare Eberline*, 636 F. App'x at 227 (concluding that evidence supported independent-contractor status where "there were no repercussions for late arrivals, [installers were] not required to check in with the Defendants when [they] arrived, . . . installers could determine how many days they worked, which days they worked, and what time slots they were available to work" and had "refused assigned installations jobs with no penalty"), *with Flores* 250 F. Supp. 3d at 486 (N.D. Cal. 2017) ("[E]ven assuming that Plaintiffs could control certain aspects of their work--i.e. lunch, vacation, which routes they accepted, and whether they delivered packages in the order listed on the manifest--their independence with respect to these minor tasks is not sufficient to establish their economic independence under [the] FLSA's economic realities test.").

Furthermore, regarding Plaintiffs' ability to hire helpers,

---

[5]The drivers were not only required to wear the uniform during deliveries, but also at the terminal prior to deliveries while sorting packages, for which they received no additional pay.  (Pls.' App. (doc. 86-25) at 1978.)

several plaintiffs testified that the helpers could only be hired with Express's permission and then remained under Express's control. For example, plaintiffs Bajracharya and Masoud testified that they had to get Express's approval to use a helper and then the helper had to go through all of Express's normal hiring procedures, such as submitting an application and filling out a background check. (Pls.' App. (doc. 86-18) 880-881; (doc. 86-14) 448-49.)   Indeed, Express's Director of Compliance, Randy Head, admitted that these "subcontractor" drivers had to sign an agreement directly with Express.  (Pls.' App. (doc. 86-27) 2228.)   And plaintiff Khalid Alfheed testified that although Express encouraged them to recruit helper drivers, Express would shift those helpers around to other drivers as it saw fit.  (Pls.' App. (doc. 86-19) 1116-17; 1130.) Plaintiff Woodrow testified that when he started working, Express had a hiring freeze so he worked for two weeks under another driver before Express hired him directly for his own routes. (*Id.* (doc. 86-24) 1919-20.)   Indeed, plaintiff Masoud testified that Express came to him and asked him to take on a new driver who had actually applied with the company but could not be hired due to a hiring freeze.  (*Id.* (doc. 86-14) 351-52.)  Masoud took on this driver as a helper, but he only worked with him for a short time before Express assigned him to another route.  (*Id.* at 354.)

Plaintiffs also testified that Express controlled their routes of deliveries. Several plaintiffs testified that they were required

by Express management to use the "Road Warrior" app.[6]   (Pls.' App. (doc. 86-13) 277-78; (doc. 86-14) 371; (doc. 86-18) 886; (doc. 86-23) 1710; (doc. 86-24) 1935; (doc. 86-25) 2031.) But Tariq Alfheed testified that he preferred Google Maps and used it without Express's knowledge.   (Express's App. (doc. 76-1) 381-82.) And plaintiffs Bajracharya and Masoud testified that although Express required them to use the Road Warrior app, they occasionally deviated from the route suggested by it if they knew a faster route. (*Id.* at 9-10; 247-48.)

Plaintiffs also note that they were often required to check in with Express's dispatchers.  Several plaintiffs testified that they were in frequent contact with Express dispatch each day, having to check in with them in the morning and check out with them when their deliveries were finished.   The drivers also had to contact the dispatchers to discuss any problems with their deliveries, such as if they could not find the address for a delivery or if a package was damaged.  And dispatch would contact the drivers whenever a delivery needed to be accelerated due to a customer's complaint, or if a customer relayed information regarding where specifically to leave a package at the delivery location. (Pls.' App. (doc. 86-1) 18-24.)   In this regard, plaintiff Bajracharya's testimony is compelling:

> Q: What do you mean when [you] say "they knick-knacked" him?
> A:  They call you when you are driving, asking about the package.  They text you while . . . you are driving [a]nd

---

[6]Express's corporate representative, John Ramoin, testified, however, that although use of a mapping app was "best practices," he had not "seen" any particular app being required.  (Pls.' App. (doc. 86-28) 2342.)

> they expect you to respon[d] right after they text you.
> And if you don't, you get, like, threatened like saying,
> like, 'Hey, you will lose the route."
> . . . .
> Q: Did you experience that same treatment?
> A: A million times, ma'am.

(*Id.* at 884.)   Furthermore, Express received a message via their scanning software every time a package was delivered, and dispatch would call a driver if they believed he had left the package at the wrong address. (Pls.' App. (doc. 86-25) 2032-33.); *see also Collinge v. IntelliQuick Delivery, Inc.*, No. 2:12-CV-00824-JWS, 2015 WL 1299369, * (D. Ariz. Mar. 23, 2015) (concluding drivers were employees in part because the company "monitors its drivers' work using its 'CXT system,' which allows [the company] to know where its drivers are at all times and to communicate with them").

Thus, after review of the evidence submitted by the parties, the Court concludes that the control factor militates in favor of the drivers' having employee status.  The drivers simply did not have the type of control over their work as one who stood as a separate economic entity from Express.

2.  Relative Investments

"In applying the relative-investment factor, [courts] compare each worker's individual investment to that of the alleged employer." *Hopkins*, 545 F.3d at 334.     So that Express did not have to present a Rule 30(b)(6) corporative representative for deposition on this subject, the parties entered into a stipulation providing that "for each of the tax years 2014, 2015, 2016, and 2017, [Express's] investment and expenses in its business operations in Dallas and Fort Worth, Texas[,] exceeded the investments and expense of each of the

[plaintiffs] providing transportation-related services to [Express] during those same tax years." (Agreed Stipulation (doc. 63) 1.) In accordance with Express's stipulation, its investment in its business exceeded the amount of Plaintiffs' investments in being delivery drivers.

Express now contends, however, that the relevant question is not which party invests more in its overall business but instead which party contributed more toward the particular work that Plaintiffs performed. In support of this proposition, Express cites *Thibault v. Bellsouth Telecommunications, Inc.*, 612 F.3d 843, 847 (5th Cir. 2010). In that case, the court noted that a prior panel had "'recognized' the overall investment by the alleged employer, but . . . did not focus on it. Instead, [that panel] compare[d] the amount the alleged employer and employee each contribute to the specific job the employee undertakes." *Id.* (citing *Carrell*, 998 F.2d at 333.) Here, there is no evidence regarding the specific amount of Express's investment in the drivers' delivery work. Plaintiffs were required to provide their own vehicles, maintain insurance on the vehicles, pay for repairs, and pay for gasoline.[7] It is also

---

[7]It appears that at least some of the plaintiffs used their delivery vehicles as their personal vehicle as well. "Although the driver's investment of a vehicle is no small matter, that investment is somewhat diluted when one considers that the vehicle is also used by most drivers for personal purposes." *Herman*, 161 F.3d at 304 (concluding that "the district court clearly erred in finding the drivers' relative investment to be significant" where they used personal vehicles to make deliveries); *see also Brock*, 814 F.2d 1042, 1051 (5th Cir. 1987) (concluding that fireworks stand operator who used in his work a computer he originally purchased as a home computer for school work had made no investment).

clear, however, that Express provided warehouses for the storage and sorting of the packages prior to delivery and dispatchers to assist the drivers in ensuring the packages were timely and properly delivered.  Although the amounts Express expended on those items has not been quantified, the Court strongly suspects such amounts are greater than any single driver's investment. Furthermore, this Court, like the panels in *Thibault* and *Carrell*, "'recognize[]' the overall investment by [Express]." *Id*.  Consequently, the Court concludes that this factor tips in favor of the drivers' having employee status.

   3.  Profit or Loss

   Under this factor, a court looks to see which party controlled "[t]he major determinants of the amount of profit [that the worker] could make." *Usery*, 527 F.2d at 1313.  Express contends that the drivers determined their profits by negotiating rates, yet it only points to one instance where a single driver (Masoud) was able to negotiate a slightly higher piece rate on a route due to the greater distance, and thus expense, incurred on that route.  Express also notes that some drivers hired additional drivers to help increase their profits, and that several drivers cut costs by purchasing cheaper cars, renting cars instead of purchasing them, or saving on insurance. Hiring, managing, training and paying additional drivers is indicative of the type of skill required of a business owner and thus militates toward independent-contractor status.  And although a driver's ability to cut costs and increase his net pay was limited due to both the cap imposed by Express on the amount of the piece rate it would pay and by the number of deliveries it made available

to drivers, the Fifth Circuit has previously concluded that the ability to "increase[] profits by controlling costs" is also indicative of independent-contractor status. *Thibault*, 612 F.3d at 846 (concluding that cable splicers were independent contractors in part because they could increase profits by controlling their costs); *see also Carrell*, 998 F.3d at 334 (although company "exerted some control over the Welders' opportunity for profits by fixing the hourly rate and the hours of work. . . . the tax returns . . . indicate that the Welders' profits also depended on their ability to control their own costs."). Consequently, the Court concludes that this factor points to the drivers' having independent-contractor status.

   4. Skill and Initiative

   Express contends that acting as one of their drivers "required planning skills as well as an understanding of pickup and delivery methods, as well as organization and vehicle know-how." (Express's Br. in Support of Mot. for Summ. J. (doc. 75) 26.) In support, Express points to testimony of some of the plaintiffs indicating that as they became more familiar with their routes and made more deliveries, they became more efficient. But for FLSA purposes, "initiative, not efficiency, determines independence." *Brock*, 814 F.2d at 1053. "Routine work which requires industry and efficiency is not indicative of independence and nonemployee status." *Usery*, 527 F.2d at 1314. "Generally, [courts] look for some unique skill set . . . or some ability to exercise significant initiative within

the business." *Hopkins*, 545 F.3d at 345.  Price testified that the only requirements for a driving position with Express were that the applicant possess a valid driver's license, have a certain type of vehicle and insurance, and pass a background test and drug screen. (Pls.' App. (doc. 86-29) 2450.)  Although Price suggested that prior experience was required, (*id.* at 2453), several of the plaintiff drivers had no prior experience. (Pls.' Br. (doc. 82) 42 (summarizing testimony of no prior experience from certain Plaintiffs).)  There is simply no evidence that any special skill set was required to be a driver for Express. *See Herman*, 161 F.3d at 305 (rejecting district court's determination that a driver who "must rely on his own judgment, knowledge of traffic patterns and road conditions in the Dallas-Fort Worth metroplex, ability to read a MAPSCO, and ability to anticipate the need for an alternate route" had "specialized skills beyond that of merely driving an automobile").  Thus, this factor weighs in favor of employee status.[8]

### 5. Permanency

"This factor weighs in favor of employee status when the work is done continuously and for a long period of time, but evidence that the worker provided similar services to others simultaneously weighs in favor of independent contractor status." *Wherley*, 2013 WL 5744335,

---

[8]Indeed, Plaintiffs performed a significant amount of unpaid work for Express sorting, scanning, and loading packages prior to their deliveries, which required virtually no business initiative or skill.

at *5; *see also Cromwell v. Driftwood Elec. Contractors, Inc.*, 348
F. App'x 57, 60 (5th Cir. 2009) (concluding this factor "did not weigh
against employee status" where the plaintiffs "worked full-time
exclusively for the defendants for approximately eleven months . .
. . [and] did not have [a] temporary, project-by-project, on-again-
off-again relationship with their purported employer"). The parties'
"owner-operator agreement" was for an indefinite term and did not
contemplate a project of limited duration, although it did permit
termination by either party on three-days' notice. *See Hopkins*, 545
F.3d at 345-46 (concluding that the length of the parties' working
relationship was a more important consideration in assessing
permanency than the fact that their contract provided for termination
by either party on a thirty-days' notice). And Plaintiffs testified
that they worked virtually exclusively for Express for a minimum of
seven months to a maximum of two years--a sufficiently long period
to be considered permanent. *See Robicheaux*, 697 F.2d at 666
(concluding that working relationships lasting "from ten months to
three years" that was, "except for insignificant work elsewhere,
exclusively with [the purported employer" was sufficient evidence
of permanence to support finding of employee status); *De Luna-Lopez
v. A Lawn and Landcare Servs. Co., LLC*, 3:11-CV-1782-M, 2013 WL
4504767, *5 (N.D. Tex. July 29, 2013) (Lynn, J.) (concluding that
permanency factor "points to employee status" where the plaintiffs
'worked exclusively for Defendant for periods of approximately 15

and 10 months, respectively").

Express contends that Plaintiffs "were free to make deliveries for other companies, which weighs in favor of independent contractor status." (Express Br. (doc. 75) 29.)  But, aside from the parties' owner-operator agreement, the only evidence Express cites for this proposition is the deposition of Tariq Alfheed.[9]  Express contends that Alfheed testified that he "operated under K & T Brothers, Inc.[,] for another company with a rented box truck." (Express's Br. (doc. 75) 29 (citing Express's App. (doc. 76) 397-98).)  Upon reading the immediately preceding pages of Alfheed's deposition, however, it is clear that Alfheed was testifying about deliveries he made **after** his work for Express ended, rather than while he was also making deliveries for Express.[10]  To militate against a finding of permanence

---

[9]Express also cites testimony from a plaintiff whose claims have been dismissed.  It is also clear from that testimony that the other work was not undertaken while working for Express. (Express's App. (doc. 76) 354.)

[10]Specifically, Alfheed testified as follows:

Q.  Okay.  Did you have any other employment or income while you drove for Express?
A.  Yes.
Q.  What was that?
. . . .
A.  Prime Time Home Healthcare.
. . . .
Q.  And what did you do for them?
A.  Just helping them, you know, get their stuff ready, help them for shopping and–
Q.  Is this like a person that you're helping?
A.  My dad.
. . . . .
A.  Doctor told me to do that, actually.  He told me,

so as support independent-contractor status, the work for other companies must be simultaneous with the work for the company at issue so as to demonstrate nonexclusivity. *See Robicheaux*, 697 F.2d at 666; *Wherley*, 2013 WL 5744335, at *5; *De Luna-Lopez*, 2013 WL 4504767, at *5. Furthermore, the reality of the situation appears to be that working for Express took virtually every waking moment for each plaintiff. (Pls.' App. (doc. 86-5) 95-96.) As a result, this factor similarly favors a finding of employee status.

    6.  Conclusion: Employee

    Four of the five factors thus militate in favor of employee status. Consequently, after consideration of the evidence highlighted in the parties' brief, the Court concludes that, while working as delivery drivers for Express, the plaintiffs were employees as that

---

you help your father.  You can't get paid for it.  So I did it.
. . . . .
Q. Okay. Other than this home healthcare aide, any other businesses or income?
A. What [sic] I'm doing Express, no. Except for the home.
Q.  Okay. Have you--did you ever set up any other delivery businesses or services outside of K & T?
A.  After Amazon?
Q.  Yes.
A.  Yes.
Q.  And what was that?
A.  The DSI like I said.
Q.  And did you operate under K & T at DSI?
A.  Yes.
Q.  So you were a contractor at DSI?
A.  Yes.

(Pls.' App. (doc. 86-20) 1359-61.)

term is defined under the FLSA.

B.  Defendant EMP LSO Holding Corporation

Defendants seek summary judgment on behalf of defendant EMP LSO Holding Corporation ("EMP LSO"), contending that Plaintiffs can present no evidence that EMP LSO was a joint employer with Express. Plaintiffs concede in their brief that no such evidence has been deduced.  Consequently, Defendants' motion is granted with respect to Plaintiffs' claims against EMP LSO.

C.  FLSA Exemptions

In Express's answer, it asserts that it is "exempt from the payment of overtime under both federal and state law, including but not limited to exemptions in the Motor Carrier Act Exemption, 29 U.S.C. § 213(b)." (Defs.' Answer and Affirmative Defenses to Pls.' Second Am. Compl. (doc. 55) 76, ¶ 9.)  Plaintiffs seek summary-judgment as to these exemptions, and Express has failed to respond to that request.  The burden of proving an exemption under the FLSA falls on the alleged employer. *See Meza v. Intelligent Mexican Mktg., Inc.*, 720 F.3d 577, 581 (5th Cir. 2013). Because Express has failed to present any proof in support of its claimed exemptions, the Court concludes that Plaintiffs are entitled to summary judgment regarding those exemptions.

D.  Damages

1.  Unpaid Overtime/Minimum-Wage Compensation

Employees who successfully assert an unpaid overtime- or minimum-

wages claim can recover from their employer "the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and . . . an additional equal amount as liquidated damages." 29 U.S.C.A. § 216(b) (West 2018). The employee has the burden of demonstrating that he performed work for which he was not correctly compensated. *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686-87 (1946), *superseded on other grounds by statute*, Portal-to-Portal Act of 1947, 29 U.S.C. § 254(a), *as recognized in Integrity Staffing Sols., Inc. v. Busk*, 135 S. Ct. 513, 519 (2014).

Nevertheless, employers are required to maintain payroll records that correctly reflect the hours worked by and wages paid to their employees. *See* 29 U.S.C.A. § 211(c) (West 2018); 29 C.F.R. § 516.2. Express admits that it did "not maintain a record of 'hours worked' by Plaintiffs." (Pls.' App. (doc. 86-8) 116.) As a result, Plaintiffs are entitled to some leeway in proving the amount and extent of the work they performed for which they were not properly compensated:

> When the employer has kept proper and accurate records the employee may easily discharge his burden [of proving that he performed work for which he was not properly compensated] by securing the production of those records. But where the employer's records are inaccurate or inadequate and the employee cannot offer convincing substitutes a more difficult problem arises. The solution, however, is not to penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work. Such a result would place a premium on an employer's failure to keep proper records in conformity with his statutory duty; it would allow the employer to keep the benefits of an employee's labors without paying due compensation as contemplated by

the [FLSA].  In such a situation we hold that an employee
has carried out his burden if he proves that he has in fact
performed work for which he was improperly compensated and
if he produces sufficient evidence to show the amount and
extent of that work as a matter of just and reasonable
inference.  The burden then shifts to the employer to come
forward with evidence of the precise amount of work
performed or with evidence to negative the reasonableness
of the inference to be drawn from the employee's evidence.
If the employer fails to produce such evidence, the court
may then award damages to the employee, even though the
result be only approximate.

*Anderson*, 328 U.S. at 687-88.  Indeed, "FLSA damages may be estimated,
especially when the employer fails to keep required payroll records."
*Olibas v. Barclay*, 838 F.3d 442, 450 (5th Cir. 2016).  Such
"[e]stimates may come from representative testimony, and the
'[t]estimony of some employees concerning the hours worked by groups
of non-testifying employees is sufficient if those who do testify
have personal knowledge of the work performed by those who do not.'"
*Id.* (quoting *Beliz v. W.H. McLeod & Sons Packing Co.*, 765 F.2d 1317,
1331 (5th Cir. 1985)).

Plaintiffs have presented various damages models that appear
to the Court to delineate the amount and extent of the uncompensated
or undercompensated work they performed as a matter of just and
reasonable inference.  Plaintiffs did not, however, specifically point
to the actual evidence supporting those damage models until the filing
of their reply brief.  (Pls.' Reply Br. (doc. 99) 19-23.)
Furthermore, Express has cited certain of Plaintiffs' testimony that
appears to negate or at least call into question portions of some
of these damage models.  (Express's Br. (doc. 75) 32.)  As a result,

the Court concludes that issues of fact preclude the award of summary judgment regarding Plaintiffs' actual damages.

2.  Good Faith/Willfulness

Unless an employer can demonstrate that he acted "in good faith and that he had reasonable grounds for believing that his act . . . was not a violation of the [FLSA]," he is also liable for liquidated damages not to exceed an amount equal to the overtime or minimum-wage compensation due to the employee.  29 U.S.C.A. § 260 (West 2018). "[A]n employer 'faces a "substantial burden" of demonstrating good faith and a reasonable belief that its actions did not violate the FLSA." *Singer v. City of Waco, Tex.*, 324 F.3d 813, 823 (5th Cir. 2003) (quoting *Bernard v. IBP, Inc. of Neb.*, 154 F.3d 259, 267 (5th Cir. 1998).  When an employer suspects that it is not in compliance with the FLSA, its violation cannot be said to have been in good faith. *See Heidtman v. Cty. of El Paso*, 171 F.3d 1038, 1042 (5th Cir. 1999).

Unsurprisingly, a violation of the FLSA cannot be said to have been in good faith where it is determined to have been willful. *Singer*, 324 F.3d at 823.  The FLSA provides for a two-year statute of limitations that may be extended to three years when the employer's violation of the statute is willful.  29 U.S.C.A. § 255(a) (West 2018).  The employee has the burden to demonstrate willfulness. *See Mohammadi v. Nwabuisi*, 605 F. App'x 329, 332 (5th Cir. 2015).  A violation is willful if the employer knew or showed reckless disregard

for whether its conduct violated the FLSA. *See McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988). An employer willfully violates the FLSA for liquidated-damages purposes when it "shows a 'disregard for the governing statute and an indifference to its requirements.'" *Martin v. Selker Bros., Inc.*, 949 F.2d 1286, 1296 (3d Cir. 1991) (quoting *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 127 (1985)). An employer's violation is not willful, however, when it is "based on nothing more than negligence, or, perhaps, on a completely good-faith but incorrect assumption that a pay plan complies with the FLSA in all respects." *McLaughlin*, 486 U.S. at 135. Furthermore, the "failure to consult an attorney, without prior notice of alleged FLSA violations, does not constitute willfulness." *Mohammadi*, 605 F. App'x at 332.

After review of the evidence and arguments submitted by the parties regarding these issues, the Court is not inclined to grant summary judgment in Plaintiffs' favor regarding the issue of Express's good faith or willfulness. Regarding willfulness, Plaintiffs have failed to point to any "smoking-gun evidence" demonstrating that Express knew or was recklessly indifferent about whether it was abiding by the FLSA with regard to Plaintiffs. There is no evidence suggesting that Express suspected it was violating the FLSA as to Plaintiffs. Plaintiffs point out that at his deposition, Express's Rule 30(b)(6) deponent relied solely on the fact that Express believed Plaintiffs were independent contractors to support his contention

that the company acted in good faith.  But it appears to the Court
that the fact that Plaintiffs signed contracts designating them as
independent contractors **does** support Express's assertion of good
faith.  Furthermore, Express is correct that some legal opinions
conclude, in somewhat different circumstances, that delivery drivers
are contractors rather than employees.  And the Court is not yet
persuaded that the fact that Express's Rule 30(b)(6) representative
failed to mention these opinions during his deposition now bars
Express from relying on them to demonstrate its good faith or lack
of willfulness.  As a result, Plaintiffs' summary-judgment motion
is denied as to these issues.

E.  Retaliation

Plaintiffs Lovo, Masoud, Urbina, Castellanos, Wilder,
Bajracharya, and the Alfheed brothers also assert an FLSA retaliation
claim against Express.  Specifically, these "retaliation plaintiffs"
contend that they were denied the opportunity to apply for additional
work with Express in March and April 2017 as a result of their
participation in this lawsuit.

The FLSA makes it unlawful for any employer "to discharge or
in any other manner discriminate against any employee because such
employee has filed any complaint . . . under or related to this
chapter." 29 U.S.C. § 215(a)(3). Such claims are similarly analyzed
as those under Title VII of the Civil Rights Act of 1964:

First, a plaintiff must make a *prima facie* showing of (1)
participation in protected activity under the FLSA; (2)

> an adverse employment action; and (3) a causal link between
> the activity and the adverse action.  If a plaintiff meets
> this burden, the defendant must then articulate a
> legitimate, non-discriminatory reason for its decision.
> The burden then shifts to the plaintiff to demonstrate that
> the proffered reason is a pretext for discrimination.

*Hagan v. Echostar Satellite, L.L.C.*, 529 F.3d 617, 624 (5th Cir.

2008).  An "adverse employment action" in this context is any action

that "would have been materially adverse to a reasonable employee."

*Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006).

In other words, "the employer's actions must be harmful to the point

that they could well dissuade a reasonable worker from making or

supporting a[n FLSA] charge." *Id.*; *McCoy v. City of Shreveport*, 492

F.3d 551, 559-60 (5th Cir. 2007).

Even assuming Plaintiffs have demonstrated, prima facie, a case

of retaliation, they have come forward with no evidence demonstrating

that Express's reason for the termination of their routes was

pretextual.  Express proffers that it terminated the retaliation

plaintiffs' routes on or about April 18, 2017, because Amazon

terminated its delivery contract with Express.  The retaliation

plaintiffs wholly fail to present any evidence demonstrating that

Express's claimed reason for the termination of their routes--the

termination of the Amazon contract--was instead a pretext for

discriminating against them due to the fact that they participated

in this lawsuit.  They must present evidence demonstrating that "the

adverse employment action would not have occurred 'but for'

plaintiff's protected activity." *Kanida v. Gulf Coast Med. Personnel*

*LP*, 363 F.3d 568, 580 (5th Cir. 2004). They have failed to present evidence demonstrating that but for the filing of this suit, their routes would not have been terminated.

Instead, the retaliation plaintiffs contend that the adverse-employment action about which they complain is not their termination, but the fact that they were not invited to a lunch meeting where Express discussed with other drivers possibly performing "LSO Parcel pickups and deliveries." (Pls.' Br. (doc. 82) 60; Pls.' App. (doc. 86-28) 2385.) The retaliation plaintiffs contend that they were not given the opportunity to perform the work discussed at the lunch meeting. But no evidence has been presented that any work was actually distributed at the lunch meeting, and the retaliation plaintiffs have failed to demonstrate that not being invited to the lunch meeting adversely impacted their ability to bid on that work. Indeed, Express's representative testified that those who did not attend the meeting were subsequently permitted to bid on the new work if they chose to do so. (Express's App. (doc. 76) 338.) The retaliation plaintiffs have not presented any evidence demonstrating that they were denied the ability to bid on the LSO routes or that they bid on those routes but were denied them. Indeed, although they have speculated that other drivers were treated more favorably regarding these routes, they have failed to actually name any such drivers or demonstrate that they were comparably situated except for

their FLSA claims.[11]  Consequently, Express is entitled to summary judgment regarding Plaintiffs' retaliation claims.

## IV.   Conclusion

For the foregoing reasons, the Court concludes that Plaintiffs' summary judgment motion should be and hereby is GRANTED to the extent it seeks a determination that, while acting as drivers for Express, Plaintiffs were employees under the FLSA.  Plaintiffs' motion is also GRANTED regarding Express's claimed exemptions under the FLSA. Conversely, Express's summary-judgment motion is GRANTED to the extent it seeks summary judgment as to the FLSA retaliation claim asserted by certain of the plaintiffs and all claims asserted against defendant EMP LSO Holding Corporation.  In all other respects, the motions are denied.

SIGNED January <u>30</u>, 2019.

_Terry R. Means_
_____
TERRY R. MEANS
UNITED STATES DISTRICT JUDGE

---

[11]Kahlid Alfheed points to a "Herman" and "Hakeem" who were allegedly given the LSO work, but he fails to provide any details about these comparators.  (Pls.'s App. (doc. 86-19) 1057-58.) Furthermore, it appears clear that the Alfheed brothers actually continued to deliver for Express after the Amazon contract was terminated.  (Express's App. (doc. 76-2) 877-78.)